## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

DAVID FALTERMEIER, on behalf of  )
himself and all others similarly situated, )
           )
      Plaintiffs,  )
           )
v.            )    Case No. 4:15-cv-00491-DGK
           )
FCA US LLC,       )
           )
      Defendant.  )

## SUGGESTIONS IN SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**Table of Contents**

Page

Table of Authorities ........................................................................................... ii

Introduction and Factual Background .........................................................................1

I.  The Uniform Safety Defect in the Rear-Mounted Fuel Tanks of the Jeep Vehicles .....1

  A.  The Existence of the Safety Defect ...........................................................3

  B.  The Uniformity of the Safety Defect ..................................................4

  C.  FCA's Ineffective Recall to Address the Safety Defect .....................................6

II.  FCA's Misrepresentations of the Jeep Vehicles .........................................................7

III.  Uniform Remedy of the Safety Hazard ........................................................8

IV.  The Proposed Class ...........................................................................10

Argument and Authorities .........................................................................10

I.  The Class Action Prerequisites of Rule 23(a) are Satisfied in this Case ...................12

  A.  Numerosity is Satisfied Because the Proposed Class of Missouri
      Consumers Numbers in the Thousands ...........................................................12

  B.  Commonality is Satisfied Because the Central Legal and Factual
      Issues in the Case are Amenable to Resolution on a Class-wide Basis .............13

  C.  Typicality is Satisfied Because Plaintiff's MMPA Claim is Similar to
      (if Not Identical to) the Class Members' MMPA Claims .................................15

  D.  Adequacy is Satisfied Because Plaintiff and His Attorneys Have No
      Conflicts of Interest With the Class and Will Vigorously Prosecute
      this Lawsuit ...........................................................................16

II.  This Case is Properly Maintained as a Class Action Under Rule 23(b)(3) .................18

  A.  The Common Legal and Factual Issues in this Case Predominate Over Any
      Individual Issues that Might Exist ...................................................18

i

|   |   | i. | Common Issues of Liability are Predominant in this Case......................19 |
|---|---|---|---|

i.    Common Issues of Liability are Predominant in this Case........................19

ii.   Common Issues of Damages are Predominant in this Case......................23

B.   The Class Action Mechanism Is the Superior Method for Adjudication of the Claims in this Case....................................................................................27

C.   The Proposed Class in this Case is Properly Defined With Reference to Objective Criteria and is Clearly Ascertainable....................................28

Conclusion ..................................................................................................................30

## Table of Authorities

**Page(s):**

**Cases:**

Alpern v. UtiliCorp United, Inc., 84 F.3d 1525 (8th Cir. 1996)....................................16

Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) ...............................................18

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184 (2013).........................11, 18-19

Blades v. Monsanto Co., 400 F.3d 562 (8th Cir. 2005).................................................11

Brown v. Bennett, 136 S.W.3d 552 (Mo. Ct. App. 2004) .............................................24

Butler v. Sears, Roebuck & Co., 727 F.3d 796 (7th Cir. 2013)....................................21

Carriuolo v. Gen. Motors Co., 823 F.3d 977 (11th Cir. 2016) ....................................26

Dale v. DaimlerChrysler Corp., 204 S.W.3d 151 (Mo. Ct. App. 2006) ................................22-23

DeBoer v. Mellon Mortg. Co., 64 F.3d 1171 (8th Cir. 1995)........................................15

Edwards v. Ford Motor Co., 603 Fed. App'x 538 (9th Cir. 2015) ................................20

Falco v. Nissan N. Am., Inc., No. 13-00686 DDP (MANx), 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016)............................................................................20-21

Glen v. Fairway Indep. Mortg. Corp., 265 F.R.D. 474 (E.D. Mo. 2010) ................................22, 28

Harmon v. Milo's Kitchen, LLC, Case No. 13-0247 (W.D. Mo.)....................................15

Hartley v. Suburban Radiologic Consultants, Ltd., 295 F.R.D. 357 (D. Minn. 2013) .................13

Henderson v. Volvo Cars of N. Am., LLC, No. 09-4146, 2013 WL 1992479
   (D.N.J. Mar. 22, 2013)..............................................................................................................21

Hope v. Nissan N. Am., Inc., 353 S.W.3d 68 (Mo. Ct. App. 2011) ........................................22, 23

Hopkins v. Kan. Teachers Cmty. Credit Union, 265 F.R.D. 483
   (W.D. Mo. 2010)............................................................................................... 14, 15-16, 19, 22

In re Celexa & Lexapro Mktg. & Sales Practices Litig.,
   MDL No. 09-02067-NMG, 2014 WL 108197 (D. Mass. Jan. 20, 2014) ..................................23

In re Dial Complete Mktg. & Sales Practices Litig., 312 F.R.D. 36 (D.N.H. 2015) ....................23

In re Gen. Motors LLC Ignition Switch Litig., 14 MD-2543 (JMF), 2016 WL 3920353
   (S.D.N.Y. July 15, 2016) .................................................................................................... 25-26

In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2011 WL 3268649
   (N.D. Cal. July 28, 2011)........................................................................................................23

In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604 (8th Cir. 2011) .........11, 15, 18, 21, 25

Janson v. LegalZoom.com, Inc., 271 F.R.D. 506 (W.D. Mo. 2010) ............... 11-15, 17, 22, 27, 29

Johns v. Bayer Corp., 280 F.R.D. 551 (S.D. Cal. 2012)..............................................................10

Keegan v. Am. Honda Motor Co., 284 F.R.D. 504 (C.D. Cal. 2012) ...........................................21

Klee v. Nissan N. Am., Inc., No. CV 12-08238 AWT (PJWx), 2015 WL 4538426
   (C.D. Cal. July 7, 2015) ..........................................................................................................21

Krause v. GE Capital Mortg. Servs., Inc., No. 97 C 8589, 1998 WL 831896
   (N.D. Ill. Nov. 20, 1998)..........................................................................................................23

Labrier v. State Farm Fire & Cas. Co., --- F.R.D. ----, 2016 WL 4005998
   (W.D. Mo. July 25, 2016) .............................................................................................11, 16, 28, 29

Lafollette v. Liberty Mut. Fire Ins. Co., No. 14-CV-04147-NKL, 2016 WL 4083478
   (W.D. Mo. Aug. 1, 2016)...................................................................................................18, 28

Larabee v. Eichler, 271 S.W.3d 542 (Mo. 2008) ........................................................................25

Lindberg Cadillac Co. v. Aron, 371 S.W.2d 651 (Mo. Ct. App. 1963).........................................24

Linquist v. Bowen, 633 F. Supp. 846, 858 (W.D. Mo. 1986)........................................................12

McClean v. Health Sys., Inc., No. 11-03037-CV-DGK, 2012 WL 607217
    (W.D. Mo. Feb. 23, 2012)........................................................................19

Michael P. v. Preferred Credit Corp., No. 10-0189-CV-W-ODS, 2012 WL 2735348
    (W.D. Mo. July 9, 2012).........................................................................19

Morehouse v. Behlmann Pontiac-GMC Truck Serv., Inc., 31 S.W.3d 55
    (Mo. Ct. App. 2000)...............................................................................24

Nieberding v. Barrett Outdoor Living, Inc., 302 F.R.D. 600 (D. Kan. 2014) ...............................21

Paxton v. Union Nat'l Bank, 688 F.2d 552 (8th Cir. 1982)..........................................13
Peel v. Credit Acceptance Corp., 408 S.W.3d 191 (Mo. Ct. App. 2013).......................................10

Plubell v. Merck & Co., 289 S.W.3d 707 (Mo. Ct. App. 2009) .......................................15, 22, 23

Prof'l Firefighters Assoc. of Omaha, Local 385 v. Zalewski, 678 F.3d 640
    (8th Cir. 2012).....................................................................................11

Roberts v. Source for Public Data, No. 2:08-cv-04167-NKL, 2009 WL 3837502
    (W.D. Mo. Nov. 17, 2009)...................................................................... 13, 17-18

Sanchez-Knutson v. Ford Motor Co., 310 F.R.D. 529 (S.D. Fla. 2015) .................................21, 26

Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc., 821 F.3d 992
    (8th Cir. 2016)................................................................................13, 19, 28

Shady Grove Orthopedic Assocs. v. Allstate Ins. Co., 559 U.S. 393 (2010) .................................11

Stephens v. Arctic Cat, Inc., No. 4:09CV02131 AGF, 2012 WL 628867
    (E.D. Mo. Feb. 27, 2012)........................................................................22

Titus v. Burns & McDonnell, Inc. Emp. Stock Ownership Plan,
    No. 09-00117-CV-W-DGK, 2010 WL 3713666 (W.D. Mo. Sept. 13, 2010) .....................12, 17

Van Orden v. Meyers, No. 4:09CV00971 AGF, 2011 WL 4600688
    (E.D. Mo. Sept. 30, 2011)........................................................................16

Viene v. Contour Motor Auto Sales, Inc., 787 S.W.2d 814 (Mo. Ct. App. 1990) ........................24

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011)............................................13, 18

Walls v. Sagamore Ins. Co., 274 F.R.D. 243 (W.D. Ark. 2011) ....................................28

Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168 (9th Cir. 2010)................................20

**Statutes:**

Mo. Rev. Stat. § 407.010 <u>et seq.</u> ....................................................................................1

Mo. Rev. Stat. § 407.020.1 ........................................................................................19

Mo. Rev. Stat. § 407.025.1 ........................................................................................19

Mo. Rev. Stat. § 407.025.2 .............................................................................. 10, 27-28

**Treatises:**

1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 1:9 (5th ed. 2011) ...................................10

1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 3:13 (5th ed. 2011) .................................12

1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 3:20 (5th ed. 2011) .................................13

1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 3:29 (5th ed. 2011) .................................16

2 William B. Rubenstein, <u>Newberg on Class Actions</u> § 4:67 (5th ed. 2012) ...............................27

## Introduction and Factual Background

Plaintiff David Faltermeier ("Plaintiff") brings this putative class action lawsuit under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 et seq. He alleges that Defendant FCA US LLC ("FCA") has caused financial harm to a putative class of Missouri consumers by misrepresenting the safety, performance and design of certain vehicles, including the Model Year 2002-2007 Jeep Liberty and the Model Year 1993-1998 Jeep Grand Cherokee (collectively, the "Jeep Vehicles").

## I. The Uniform Safety Defect in the Rear-Mounted Fuel Tanks of the Jeep Vehicles

Plaintiff's First Amended Complaint Class Action Complaint (the "Complaint") alleges that the Jeep Vehicles are defective because they are designed with a faulty plastic fuel tank positioned behind the rear axle without sufficient protection or structural support to withstand rear impact collisions that may cause the fuel tanks to rupture and ignite. (See Compl., Doc. #65, ¶¶ 2, 14-24.) This defect was the subject of an almost four-year-long investigation by the Office of Defects Investigation ("ODI") of the National Highway Transportation Safety Administration ("NHTSA"), which began with the review of Defect Petition No. 09-005 filed by the Center for Auto Safety in November 2009, continued with Preliminary Evaluation No. 10-031 beginning in August 2010, and culminated with Engineering Analysis No. 12-005 that was opened in June 2012.[1]

---

[1] A Defect Petition is first screened by NHTSA's Defects Assessment Division, and "[i]f the petition is granted, a defect investigation is opened." The defect investigation is then conducted in two phases: a Preliminary Evaluation ("PE") and an Engineering Analysis ("EA"). In the PE phase, "ODI obtains information from the manufacturer (including, but not limited to, data on complaints, crashes, injuries, warranty claims, modifications, and part sales) and determines whether further analysis is warranted. . . . In the event that ODI believes further analysis is warranted, the PE is upgraded to an Engineering Analysis." In an EA, "ODI conducts a more detailed and complete analysis of the character and scope of the alleged defect. The EA builds on information collected during the PE and supplements it with appropriate inspections, tests, surveys, and additional information obtained from the manufacturer and suppliers. . . . [I]f

1

On June 3, 2013, after completing its Engineering Analysis of the Jeep Vehicles, NHTSA issued a Recall Request Letter to FCA (then known as Chrysler Group, LLC),[2] which stated the belief that the Jeep Vehicles "contain defects related to motor vehicle safety," and reached the following conclusion:

> ODI's tentative assessment is that [the Jeep Vehicles] contain defects related to motor vehicle safety. In our tentative view, there is a performance defect and a design defect. The performance defect is that the fuel tanks installed on these vehicles are subject to failure when the vehicles are struck from the rear. Such failure can result in fuel leakage, which in the presence of external ignition sources, can result in fire. The design defect is the placement of the fuel tanks in the position behind the axle and how they were positioned, including their height above the roadway. The defects present an unreasonable risk to motor vehicle because people in the [Jeep Vehicles] and in striking vehicles have burned to death in rear impact crashes, there have been fires (without fatalities) in these vehicles from rear impact crashes that have, or could have, led to deaths and injuries, and there have been leaks from Grand Cherokee and Liberty gas tanks from rear impact crashes that could have led to fire and death or injury.

(Compl. Ex. A, Doc. #65-1, at 1, 12.)

---

ODI believes that the data developed indicates that a safety-related defect exists, the ODI investigator prepares a briefing to be presented to a panel of experts from throughout the agency for peer review. If the agency panel concurs with ODI's recommendation that a recall should be conducted, ODI notifies the manufacturer of the panel's concurrence and may, if appropriate, provide a final opportunity for the manufacturer to present new analysis or data. ODI then sends a Recall Request Letter to the manufacturer." See U.S. Department of Transportation, Motor Vehicle Safety Defects and Recalls: What Every Vehicle Owner Should Know, at 8-9, available at: www-odi.nhtsa.dot.gov/recalls/documents/MVDefectsandRecalls.pdf.

[2]   FCA – short for Fiat Chrysler Automobiles -- purchased assets and liabilities of Chrysler LLC, the predecessor of Chrysler Corporation (the designer and manufacturer of the subject Jeep Grand Cherokee vehicles) and DaimlerChrysler Corporation (the designer and manufacturer of the subject Jeep Liberty vehicles). (Compl., Doc. #65, ¶ 6.) FCA initially was known as Chrysler Group, LLC before changing its name to FCA, and NHTSA has described FCA as the "manufacturer" of the Jeep Vehicles through its "predecessors" – i.e., Chrysler Corporation and DaimlerChrysler Corporation. (Id. ¶ 6 & Ex. A at 1.) FCA "designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram and Fiat brands," and boasts that it "is building upon the historic foundations of Chrysler, the innovative American automaker first established by Walter P. Chrysler in 1925." About Us – FCA US LLC, available at: http://www.fcanorthamerica.com/company/AboutUs/Pages/AboutUs.aspx. FCA is often referred to as Chrysler in the materials filed with this brief, and is sometimes referred to as Chrysler in this brief, as well.

### A.       The Existence of the Safety Defect

Attached as **Exhibit 1** is the Declaration of Mark W. Arndt, Plaintiff's designated expert on class certification issues, stating his opinion that "[t]he Jeep Vehicles present a safety hazard because they are designed with a fuel tank located behind the rear axle of the vehicle without sufficient protection for a fuel tank located in that area," which "creates an unreasonable safety risk to vehicle occupants in the event of a rear-end collision." (Arndt Decl., Ex. 1, ¶ 14.) This safety defect is demonstrated by a substantial body of evidence, including evidence of custom and practice showing that the design of the fuel tank system for the Jeep Vehicles "contravened industry trends to place fuel tanks in less vulnerable locations either ahead of or over the rear axle," and also contravened Chrysler's own design practices for Dodge-brand vehicles that were built with fuel tanks located ahead of the rear axle, which Chrysler recognized as a "safety feature" intended to "provide protection against [fuel] leakage during side, rear and angular front impacts." (Id. ¶ 14(a), (c).)

The design of the Jeep Vehicles also violated Chrysler's own engineering opinion that a fuel tank should be located ahead of the rear axle "to protect the tank from being damaged in a collision," and if the tank could not be located ahead of the rear axle, then it should be guarded by "a protective impact deflection structure." (Id. ¶ 14(b).) The Jeep Vehicles did not include any "protective deflection structure" that would meet these engineering recommendations for preventing fuel tank failure in rear-impact collisions. (Id. ¶ 14(g).)

Moreover, certain design characteristics of the Jeep Vehicles make their insufficiently protected rear-mounted fuel tanks particularly vulnerable in rear-impact collisions. For example, the fuel tanks are located in close proximity to the rear bumper and are exposed to direct contact from striking vehicles because the ground clearance and ride height of the Jeep Vehicles allows a low-riding passenger car to "underride" a Jeep Vehicle in a rear-impact collision. (Id. ¶ 14(e).)

3

The fuel tanks of the Jeep Vehicles also are located in the "crush zone" – a structural feature that is designed to absorb crash forces through deformation; without sufficient protection, the fuel tanks placed in the crush zone are highly susceptible to deformation and puncture in rear-impact collisions. (Id. ¶ 14(f).) In fact, Chrysler's own engineers have expressed the opinion that there "should be no crush in [the fuel] tank area," and Chrysler's design guidelines for fuel systems state that "[t]he [fuel] tank should be located in a manner that avoids known impact areas" in rear-impact collisions. (Id. ¶ 16(i).)

Data compiled by NHTSA during its defect investigation indicates that the Jeep Vehicles are "poor performers" when compared to their peers with respect to the incident rate of fatal rear-impact crashes that resulted in fire, and are the "worst performers" among all vehicles analyzed (excluding one model manufactured in relatively small numbers for a limited period of time) with respect to the incident rate of non-fatal rear-impact crashes that resulted in fire or fuel leak. (Id. ¶ 14(h)-(i).) This data contributed to NHTSA's conclusion that the Jeep Vehicles "contain defects related to vehicle safety." (Id. ¶ 14(j).)

As further evidence of the safety-related defect, a peer-reviewed study has shown that relocating fuel tanks ahead of the rear axle "has a substantial effect on the reduction of [fire-related] deaths in rear impacts." (Id. ¶ 14(d).) Crash tests conducted on a peer vehicle with the fuel tank located ahead of the rear axle showed significantly better crash-resistance in rear-impact collisions, and it has been noted that there have been no incidents of fire in rear-impact collisions involving later models of the Jeep Vehicles that were redesigned to move their fuel tanks ahead of the rear axle. (Id. ¶ 14(k)-(l).)

## B. The Uniformity of the Safety Defect

Mr. Arndt opines that "[t]he unreasonable safety risk created by the lack of sufficient protection for the rear-mounted fuel tanks in the Jeep Vehicles is a common hazard that exists in

4

all Jeep Vehicles comprising the potential class." (Id. ¶ 15.) The Jeep Grand Cherokee vehicles are all built on a single platform (ZJ) and were "designed with a fuel tank located aft of the rear axle and within close proximity to the rear bumper"; they all have plastic fuel tanks that are vulnerable in rear-impact collisions because they have "more ground clearance and higher ride height that conventional passenger cars." (Id. ¶ 15(a).) The Jeep Liberty vehicles are similarly built on a single platform (KJ) and designed with "a fuel tank located aft of the rear axle and less than a foot forward of the back face of the rear bumper"; these vehicles also have plastic fuel tanks that are "exposed to impacts from passenger cars because of the Liberty's comparatively high ground clearance and ride height." (Id. ¶ 15(b).)

FCA describes all of the Jeep Vehicles as "light-duty vehicles manufactured with the fuel tank aft of the rear axle," and it represented to NHTSA during the defect investigation that fuel tank protection in rear-impact collisions is provided only by "the vehicle structure surrounding the fuel tanks, including body cross members and frame rails." (Id. ¶ 15(c).) The Jeep Vehicles did not come standard with any additional structural protection or reinforcement devices such as a fuel tank shield (or skid plate) or trailer hitch assembly. (Id.)

From this evidence, Mr. Arndt concludes that the Jeep Vehicles "are all characterized by the common trait of having an insufficiently protected rear-mounted, behind the axle, plastic fuel tank in close proximity to the rear bumper." (Id. ¶ 15(d).) This description of a uniform defect is consistent with NHTSA's identification of the hazard that exists in all Jeep Vehicles because "[t]he fuel tanks in these vehicles are at risk of failure and leakage in certain rear impacts," and "[a] fuel leak in the presence of an ignition source may result in a fire." (Id. ¶ 15(d).) It also is corroborated by FCA's own admissions during NHTSA's defect investigation and subsequent safety recall that the fuel tanks on the Jeep Vehicles have "a small chance of experiencing a fuel leak during certain types of rear end collisions," that "in the presence of an ignition source [a fuel

5

leak] can result in an underbody fire," and that this safety hazard exists in 100% of the vehicle population.  (Id. ¶ 15(d)-(e).)

> **C.     FCA's Ineffective Recall to Address the Safety Defect**

Following NHTSA's Recall Request Letter, FCA eventually agreed to conduct a safety recall to "upgrade the rear structure" of the Jeep Vehicles by installing a trailer hitch assembly that was intended to "incrementally improve" fuel system integrity only in "certain types of low-speed impacts."  (Id. ¶ 16(a).)  Mr. Arndt opines that this proposed recall remedy "is insufficient to remedy the safety hazard presented by the fuel tanks in the Jeep Vehicles" because "[t]he benefit of an added trailer hitch is limited at best and does not address fundamental aspects of the safety hazard presented by insufficiently protected rear-mounted fuel tanks in the Jeep vehicles." (Id. ¶ 16, 16(b).)

By its own admission, Chrysler acknowledges that the trailer hitch remedy "cannot, and will not, mitigate the risk of . . . high energy rear collisions."  (Id. ¶ 16(c).)  And even in low- or moderate-speed collisions, the trailer hitch remedy does not address certain likely failure modes involving: vehicle underride that allows direct contact with the portion of the fuel tank hanging below the trailer hitch assembly; trailer hitch fracture that results in sharp projectiles capable of puncturing the nearby fuel tank; and off-center or angular strikes that negate the effectiveness of the trailer hitch by preventing the hitch receiver tube from engaging crash forces and limiting the underride of the striking vehicle.  (Id. ¶ 16(d)-(f).)

The inability of the trailer hitch to resolve the safety defect presented by the rear-mounted fuel tanks in the Jeep Vehicles is demonstrated by several incidents of fire resulting from rear-impact collisions involving Jeep Vehicles or similar Jeep models equipped with trailer hitches. (Id. ¶ 16(g).)  It also is evident from the results of crash tests performed by NHTSA's Vehicle Research and Test Center ("VRTC"), which do not rule out fuel tank failure in likely scenarios

of vehicle underride and off-center strikes, and conclusively show that even with the trailer hitch assembly, the fuel tanks in the Jeep Vehicles remain vulnerable to direct contact from striking vehicles and to substantial crush and significant intrusion from the hitch itself and from other nearby components. (Id. ¶ 16(h), (j).) At a minimum, the documented performance of the trailer hitch assembly in the VRTC tests is at odds with Chrysler's engineering recommendation that there "should be no crush in [the fuel] tank area" and its design guidelines stating that a fuel tank "should be located in a manner that avoids known impact areas" and "[n]o contact should occur" between the fuel tank and unfriendly surfaces during rear-impact collisions. (Id. ¶ 16(i).)

## II.    FCA's Misrepresentations of the Jeep Vehicles

Immediately after NHTSA issued its Recall Request Letter on June 3, 2013, FCA began a public marketing campaign that repeatedly, pervasively and uniformly misrepresented the safety, performance and design of the Jeep Vehicles. This campaign began with a press release issued by FCA on June 4, 2013, which stated that the Jeep Vehicles "are safe and are not defective." (Compl. Ex. F, Doc. #65-6, at 1.) This press release quoted FCA Chairman and CEO Sergio Marchionne stating that "[t]he safety of drivers and passengers has long been the first priority from Chrysler brands," and that the company would "continue working with NHTSA to provide information confirming the safety of these vehicles." (Id.) It also represented to consumers that the Jeep Vehicles were safe because the vehicles "met and exceeded all applicable requirements of the Federal Motor Vehicle Safety Standards, including FMVSS 301, pertaining to fuel-system integrity" and experienced failure rates "similar to comparable vehicles produced and sold during the time in question." (Id.) Chrysler then continued making similar statements to the general public regarding the safety and performance of the Jeep Vehicles in another press release and in statements disseminated through national media outlets. (Compl., Doc. #65, ¶¶ 33(b), 36(a)-(e); Compl. Exs. G-L, Doc. ##65-7, 65-8, 65-9, 65-10, 65-11 and 65-12.)

7

Given the record outlined above, Mr. Arndt opines that "the representations made by Chrysler/FCA about the Jeep Vehicles – e.g., that those vehicles 'are safe and are not defective' and that the rate of fuel tank failure in those vehicles 'is similar to comparable vehicles produced and sold during the time in question' – are untrue."  (Arndt Decl., Ex. 1, ¶ 15(f).)  Mr. Arndt's declaration also explains the deceptive and misleading nature of FCA's representations that the Jeep Vehicles are safe because they comply with a prior version of FMVSS 301 that is no longer in effect:

> Chrysler had stated that the rear-mounted fuel tank design in the Jeep Vehicles complied with the then-applicable Federal Motor Vehicle Safety Standard ("FMVSS") 301 pertaining to fuel system integrity, but this does not rule out the existence of a safety hazard.  As NHTSA notes, "a FMVSS does not preclude a finding of a safety related defect in a vehicle when supported by the evidence." (NHTSA Recall Request Letter, Ex. 3, at 4.)  Moreover, the prior version of FMVSS 301 was ill-suited to replicate the actual concentration of force that would occur in a rear impact collision of a Jeep Vehicle by a lower-profile passenger car; crash tests commissioned by the Center for Auto Safety indicate that the fuel tanks in the Jeep Vehicles would not pass the current version of FMVSS 301, which more realistically replicates these crash forces.  (CAS White Paper, Ex. 11, at 8-9.)

(Id. ¶ 14(m).)

## III.  Uniform Remedy of the Safety Hazard

With the ineffectiveness of the trailer hitch remedy to resolve the safety defect in the fuel tanks of the Jeep Vehicles, the Complaint alleges that consumers have been put "in a position of bearing the cost for alternative repairs" that would bring the vehicles into conformance with FCA's representations of safety and non-defectiveness.  (Compl., Doc. #65, ¶ 37.)  In this regard, Mr. Arndt opines that "[b]ecause the fuel tank safety hazard is uniform across all Jeep Vehicles in the proposed class, a more effective remedy to address that safety hazard could be applied uniformly to those vehicles."  (Arndt Decl., Ex. 1, ¶ 17.)    In particular, Mr. Arndt notes that "the addition of a steel shield (or skid plate) to encapsulate the fuel tank could provide improved

8

protection for the fuel tank against puncture and leaking in rear-impact collisions."  (Id. ¶ 17(b).)
This alternative remedy finds broad support from a Chrysler engineer (who recommends use of a
"protective deflection structure" for guarding rear-mounted fuel tanks); the Motor Vehicle Fire
Research Institute (which states that fuel tank "shields may be used to increase the fuel system's
resistance to damage resulting from direct contact and debris by providing an additional layer of
protection" in rear-impact collisions); and the Center for Auto Safety (which describes the fuel
tank shield as a "simple and inexpensive" remedy).  (Id.)

Mr. Arndt notes that "[a] fuel tank shield would provide increased protection in the event
of a rear impact collision," particularly for failure modes where the trailer hitch is ineffective,
including under-ride collisions, off-center strikes and impacts that cause fracture of deformation
of the trailer hitch.  (Id. ¶ 17(c).)  In fact, Chrysler used a fuel tank shield as a recall remedy in a
similar situation where tests showed that the fuel system of the 2002 Model Year Jeep Grand
Cherokee was prone to fuel leaks due to "deformation" of the fuel tank in rear-impact collisions.
(Id. ¶ 17(d).)  Chrysler acknowledged to NHTSA that the fuel tank shield was effective because
it "encompasses the tank assembly," and Chrysler advised its dealers that the fuel leak problem
could be addressed with the installation of the fuel tank shield because it prevented fuel tank
deformation in a rear-impact collision.  (Id.)

Fuel tank shields/skid plates are available for the Jeep Vehicles through both OEM and
aftermarket suppliers.  For example, the Supplemental Declaration of Lawrence Brookes states
that an OEM skid plate is available for the Jeep Liberty vehicles at a cost of approximately $455.
(Id. ¶ 17(e); Supp. Decl. of Lawrence Brookes, attached as **Exhibit 3**, ¶ 4.) Aftermarket retailers
sell fuel tank shields/skid plates for the Jeep Vehicles ranging in cost from $320 to $356.  (Arndt
Decl., Ex.1, ¶ 17(e) & Ex. 29.)

**IV. The Proposed Class**

As discussed below, the theory of liability in this case asserts that Missouri consumers who purchased Jeep Vehicles after FCA began misrepresenting those vehicles as safe and non-defective have suffered economic harm from purchasing vehicles that did not meet the quality and character represented by FCA. This economic harm is measured by the cost to repair those vehicles to bring them into conformance with FCA's representations that the Jeep Vehicles are safe and non-defective (i.e., the cost of a fuel tank shield/skid plate). With this theory in mind, Plaintiff proposes certification of the following class:

> All current owners of a Model Year 2002-2007 Jeep Liberty vehicle or a Model Year 1993-1998 Jeep Grand Cherokee vehicle that was not equipped with a fuel tank shield/skid plate at the time of purchase, who purchased the vehicle in the State of Missouri for personal, family or household purposes at any time from June 4, 2013 to the present.

## Argument and Authorities

"Class actions promote administrative efficiency in at least three ways: by avoiding a multiplicity of actions, by enabling claim processing through representatives, and by preventing inconsistent adjudications." 1 William B. Rubenstein, Newberg on Class Actions § 1:9 (5th ed. 2011). "Class action certifications to encourage compliance with consumer protection laws are desirable and should be encouraged." Johns v. Bayer Corp., 280 F.R.D. 551, 555 (S.D. Cal. 2012). This is certainly true for the MMPA, a statute that is "unrestricted, all-encompassing and exceedingly broad" and is designed to protect consumers against "every practice imaginable and every unfairness to whatever degree." Peel v. Credit Acceptance Corp., 408 S.W.3d 191, 208 (Mo. Ct. App. 2013). To effectuate its broad remedial purpose, the MMPA expressly authorizes class action treatment where a defendant's alleged unlawful practice "has caused similar injury to numerous other persons." Mo. Rev. Stat. § 407.025.2.

Class actions in federal court are governed by Federal Rule of Civil Procedure 23, which is "designed to further procedural fairness and efficiency." Shady Grove Orthopedic Assocs. v. Allstate Ins. Co., 559 U.S. 393, 402 (2010). Rule 23 requires a two-step analysis for certification of a class action: "First, under Rule 23(a), the proposed class must satisfy the requirements of numerosity, commonality, typicality, and fair and adequate representation. Second, the proposed class must meet at least one of the three requirements of Rule 23(b)." Labrier v. State Farm Fire & Cas. Co., --- F.R.D. ----, 2016 WL 4005998, at *4 (W.D. Mo. July 25, 2016) (internal citations omitted).

Although the court must conduct a "rigorous analysis" of the Rule 23 requirements, the Supreme Court has emphasized that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013); see also In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 617 (8th Cir. 2011) ("While disputes about Rule 23 criteria may overlap with questions going to the merits of the case, the district court should not resolve the merits of the case at class certification."). A court deciding a motion for class certification conducts a "limited preliminary inquiry," looking behind the pleadings "only so far as to determine whether, given the factual setting of the case, if the plaintiff's allegations are true, common evidence could suffice to make out a prima facie case for the class." Janson v. LegalZoom.com, Inc., 271 F.R.D. 506, 509-10 (W.D. Mo. 2010) (citing Blades v. Monsanto Co., 400 F.3d 562, 567 (8th Cir. 2005)).

The court "is accorded broad discretion to decide whether certification is appropriate." Prof'l Firefighters Assoc. of Omaha, Local 385 v. Zalewski, 678 F.3d 640, 645 (8th Cir. 2012). Here, the Court should grant Plaintiff's motion for class certification because all requirements of Rules 23(a) and 23(b)(3) are satisfied.

# I. The Class Action Prerequisites of Rule 23(a) are Satisfied in this Case

Rule 23(a) establishes the four prerequisites for class certification, as follows:

> One or more members of a class may sue . . . as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "In considering class certification motions, the Court liberally construes Rule 23(a) and does not resolve the merits of the dispute." Janson, 271 F.R.D. at 510. The four requirements of Rule 23(a) are all satisfied in this case.

## A. Numerosity is Satisfied Because the Proposed Class of Missouri Consumers Numbers in the Thousands

To satisfy the numerosity requirement of Rule 23(a)(1), "[a] plaintiff need not specify an exact number of class members, but must show only that joinder is impracticable through some evidence or reasonable estimate of the number of purported class members." Linquist v. Bowen, 633 F. Supp. 846, 858 (W.D. Mo. 1986); see also Rubenstein, supra, § 3:13 ("[A] plaintiff must show enough evidence of the class's size to enable the court to make common sense assumptions regarding the number of putative class members."). "While there is technically no magic number threshold that a plaintiff must meet to satisfy this requirement, it is likely that certification is proper when there are at least 40 potential class members." Titus v. Burns & McDonnell, Inc. Emp. Stock Ownership Plan, No. 09-00117-CV-W-DGK, 2010 WL 3713666, at *2 (W.D. Mo. Sept. 13, 2010).

Here, FCA submitted evidence in the course of litigation showing that more than 8,000 Jeep Vehicles have been sold in Missouri during the class period. (Decl. of Lawrence Brookes, attached as **Exhibit 2**, ¶ 4.) This demonstrates that the proposed class of Jeep Vehicle owners numbers in the thousands, and is more than sufficient to satisfy the numerosity requirement.

**B.     Commonality is Satisfied Because the Central Legal and Factual Issues in the Case are Amenable to Resolution on a Class-wide Basis**

"The 'common contention' in Rule 23(a)(2) 'must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc., 821 F.3d 992, 998 (8th Cir. 2016) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).  This is not an onerous requirement in most cases because "for purposes of Rule 23(a)(2) even a single common question will do."  Dukes, 564 U.S. at 359; Rubenstein, supra, § 3:20 ("The commonality test is more qualitative than quantitative, and thus, there need be only a single issue common to all members of the class.  Though the Dukes Court found commonality lacking, the requirement is easily met in most cases.").  "As a general rule, the commonality requirement imposes a very light burden on a plaintiff seeking to certify a class and is easily satisfied."  Hartley v. Suburban Radiologic Consultants, Ltd., 295 F.R.D. 357, 376 (D. Minn. 2013).

With regard to issues of law, the commonality requirement "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." Janson, 271 F.R.D. at 510 (quoting Paxton v. Union Nat'l Bank, 688 F.2d 552, 561 (8th Cir. 1982)).  For this determination, "the appropriate focus is on the conduct of the defendants, not the plaintiffs."  Roberts v. Source for Public Data, No. 2:08-cv-04167-NKL, 2009 WL 3837502, at *3 (W.D. Mo. Nov. 17, 2009).  Here, the overarching legal issue in the case is whether FCA violated the MMPA by misrepresenting the Jeep Vehicles as safe and non-defective.  This issue applies equally to each member of the class and demonstrates sufficient commonality to certify Plaintiffs' MMPA claim.  See Janson, 271 F.R.D. at 510 (holding that the question of whether the MMPA prohibits defendant's conduct satisfies commonality because it is a "legal issue . . .

common to all Plaintiffs"); Hopkins v. Kan. Teachers Cmty. Credit Union, 265 F.R.D. 483, 487 (W.D. Mo. 2010) (holding that the "basic common question" whether defendants complied with Missouri law "suffices to meet the commonality requirement").

Commonality with regard to issues of fact is demonstrated "if the class members' claims derive from a common nucleus of operative facts." Hopkins, 265 F.R.D. at 487. Here, the MMPA claim asserted on behalf of the class is derived from a common nucleus of operative facts concerning the existence of a uniform safety defect in the fuel tanks of the Jeep Vehicles, the inability of FCA's trailer hitch remedy to resolve that defect, FCA's misrepresentations about the Jeep Vehicles that were uniformly made to all class members throughout the class period (via press releases and public statements made to the general public), and the availability of a uniform remedy for the Jeep Vehicles that would allow the vehicles to conform to FCA's representations of safety and non-defectiveness.

These common questions of fact can be resolved on a class-wide basis through use of common evidence. For example, Mr. Arndt explains that

> The existence of a safety hazard in the fuel tank design of the Jeep Vehicles can be proven with common evidence . . . regarding industry standards regarding fuel tank location, Chrysler's knowledge of the risks of rear-mounted fuel tanks and its design practices in other vehicles, studies showing risk reduction of relocated fuel tanks, the characteristics of the Jeep Vehicles that make their rear-mounted fuel tanks vulnerable in rear-impact collisions, accident data compiled by NHTSA regarding the relative rate of incidents of fatal and non-fatal fires and fuel leaks in Jeep Vehicles involved in rear-impact collisions, and crash test data showing the relatively poor performance of the Jeep Vehicle fuel tanks in rear-impact collisions when compared to peer vehicles.

(Arndt Decl., Ex. 1, ¶ 15(f).) In addition, Mr. Arndt explains that "[t]his common evidence demonstrates that the representations made by Chrysler/FCA about the Jeep Vehicles – e.g., that those vehicles "are safe and are not defective" and that the rate of fuel tank failure in those vehicles "is similar to comparable vehicles produced and sold during the time in question – are

untrue." (Id.) And "[b]ecause the fuel tank safety hazard is uniform across all Jeep Vehicles in the proposed class, a more effective remedy to address the safety hazard [i.e., the addition of a fuel tank shield/skid plate] could be applied uniformly to those vehicles." (Id. ¶ 17.)

Establishing liability in this case will not depend on individualized fact questions because the MMPA does not impose reliance and scienter requirements. Plubell v. Merck & Co., 289 S.W.3d 707, 713-14 (Mo. Ct. App. 2009). As other courts in this District have acknowledged, this makes Plaintiff's MMPA claim particularly well suited for class certification. (See Order in Harmon v. Milo's Kitchen, LLC, Case No. 13-0247 (W.D. Mo.), Doc. #25, at 7-9, attached as **Exhibit 4**.) The Eighth Circuit confirmed in Zurn Pex that the absence of a reliance requirement makes the commonality of the class claims readily apparent: "In the case of . . . claims premised on a universal and inherent product defect, . . . plaintiffs may rely on common evidence to establish a prima facie case because there is no similar individual reliance requirement for such claims." Zurn Pex, 644 F.3d at 619. This common thread "differentiates" this case from Dukes (where the Supreme Court found a lack of commonality) because "the evidence of a universal defect raises a critical question common to all members of the class[]." Id. at 619 n.7. With the significant issues of law and fact that are common to all class members, the Court should find that the commonality prerequisite is satisfied.

## C. Typicality is Satisfied Because Plaintiff's MMPA Claim is Similar to (if Not Identical to) the Class Members' MMPA Claims

For purposes of Rule 23(a)(3), "[t]ypicality means that there are other members of the class who have the same or similar grievances as the plaintiff." Janson, 271 F.R.D. at 511. "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1174 (8th Cir. 1995); see also Hopkins, 265 F.R.D. at 487 (noting that the typicality requirement is "fairly

easily met"); Rubenstein, supra, § 3:29 ("the test for typicality is not demanding"). It has been stated that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" so that "a finding of commonality frequently supports a finding of typicality." Van Orden v. Meyers, No. 4:09CV00971 AGF, 2011 WL 4600688, at *8 n.5 (E.D. Mo. Sept. 30, 2011).

Here, as discussed above, the claims of Plaintiffs and the class arise from the same course of conduct by FCA and can be proven with the same common evidence for all class members regarding the uniform defect in the Jeep Vehicles, the uniform misrepresentation of that defect, and the uniform economic harm to class members who are faced with making repairs to their vehicles. The underlying facts of Plaintiff's MMPA claim are no different than the class claims: he is a typical Missouri consumer who purchased a misrepresented Jeep Vehicle just like the rest of the class, and has suffered economic harm from the purchase of that vehicle. Under these circumstances, the Court should find that the typicality prerequisite is satisfied. See Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996) (typicality satisfied when the named plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory").

### D.      Adequacy is Satisfied Because Plaintiff and His Attorneys Have No Conflicts of Interest With the Class and Will Vigorously Prosecute this Lawsuit

The adequacy requirement of Rule 23(a)(4) tests whether a class representative and class counsel will protect the interests of absent class members. "The adequacy requirement is met where 1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and 2) each representative's interests are sufficiently similar to those of the class that it is unlikely their goals and viewpoints will diverge." Labrier, 2016 WL 4005998, at *8.

In sum, "[t]he purpose of the adequacy requirement is to ensure that there are no potential conflicts of interest between the named parties and the class they seek to represent." Janson, 271 F.R.D. at 511. To satisfy the adequacy requirement, a named plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." Titus, 2010 WL 3713666, at *3. Here, Plaintiff meets this requirement because he seeks the same recourse as the class and has no divergent interests. Attached as **Exhibit 5** is Plaintiff's Declaration, stating that he is dedicated to representing the class, is a member of the class with claims similar to all class members, does not have any conflicts of interest with the class, has been actively involved in the litigation of this case, and understands the duties he owes to the class if he is appointed as the representative. (Decl. of David M. Faltermeier, Ex. 5, ¶¶ 2-8.)

Plaintiff's counsel are similarly committed to the vigorous prosecution of this lawsuit and have substantial experience in litigating complex class actions, including consumer protection lawsuits under the MMPA. Attached as **Exhibit 6** is a Declaration of Plaintiff's counsel, which demonstrates that the attorneys with the law firm of Shank & Moore, LLC are committed to the vigorous prosecution of this case, are qualified to serve as class counsel, and are experienced in litigation of class actions and other complex cases, having been appointed as class counsel in several other matters. Under these circumstances, Plaintiff's counsel are presumptively adequate to represent the class. See Titus, 2010 WL 3713666, at *3 ("[I]n the absence of evidence, the Court will presume that class counsel is adequate."); Roberts, 2009 WL 3837502, at *3 ("In the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to vigorously prosecute the class action.").

Because Plaintiff and his counsel have no conflicts of interest with the class, are qualified and are prepared to vigorously prosecute this lawsuit on behalf of the class, the Court should find that the adequacy prerequisite is satisfied.

## II.     This Case is Properly Maintained as a Class Action Under Rule 23(b)(3)

In addition to satisfying the prerequisites of Rule 23(a), class certification requires that one element of Rule 23(b) also is satisfied.  At issue in this case is the predominance/superiority element outlined in Rule 23(b)(3), which authorizes a class action if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) "is the most appropriate avenue of certification when the case seeks money damages," Titus, 2010 WL 3713666, at 3, and it "allows class certification in a much wider set of circumstances" than other provisions of Rule 23(b), Dukes, 564 U.S. at 362. In this case, class certification is appropriate under Rule 23(b)(3) because the predominance and superiority requirements both are satisfied.

### A.     The Common Legal and Factual Issues in this Case Predominate Over Any Individual Issues that Might Exist

"Rule 23(b)(3)'s requirement that common issues of fact or law must predominate over individual questions 'tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation.'"  Zurn Pex, 644 F.3d at 618 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)).  "In other words, it goes to the efficiency of a class action as an alternative to individual suits."  Lafollette v. Liberty Mut. Fire Ins. Co., No. 14-CV-04147-NKL, 2016 WL 4083478, at *9 (W.D. Mo. Aug. 1, 2016).  Significantly, the Supreme Court in Amchem noted that "[p]redominance is a test readily met in certain cases alleging consumer . . . fraud."  Id. at 625.

Rule 23(b)(3) requires only "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  Amgen, 133 S. Ct. at 1191.  Indeed, the Supreme Court in Amgen cautioned that "the office of a Rule 23(b)(3)

certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." Id. The predominance requirement is not a bright line test, but "is met if there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, obviating the need to examine each class member's individual position." McClean v. Health Sys., Inc., No. 11-03037-CV-DGK, 2012 WL 607217, at *4 (W.D. Mo. Feb. 23, 2012) (internal citations and brackets omitted).

"Rule 23(b)(3) does not forbid the existence of individualized issues – to the contrary, it specifically contemplates that they will exist. All Rule 23(b)(3) requires is that the common issues predominate over the individual issues that do exist." Michael P. v. Preferred Credit Corp., No. 10-0189-CV-W-ODS, 2012 WL 2735348, at *3 (W.D. Mo. July 9, 2012). To determine if common issues predominate, the Court "consider[s] what will have to be proved at trial and whether those matters can be presented by common proof or whether individual proof will be required." Hopkins, 265 F.R.D. at 488. Here, the substantial common issues of liability and damages that are subject to common proof will predominate over any individual issues.

### i. Common Issues of Liability are Predominant in this Case

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." Sandusky, 821 F.3d at 998. The MMPA expressly creates a cause of action for any consumer who "suffers an ascertainable loss of money . . . as a result of the use or employment by another person of a method, act or practice declared unlawful" under the statute. Mo. Rev. Stat. § 407.025.1. The unlawful practices prohibited by the MMPA include "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Id. § 407.020.1.

Here, FCA's liability can be determined on a class-wide basis in all necessary respects. Liability begins with the existence of a common safety defect in the Jeep Vehicles, which FCA uniformly and consistently misrepresented throughout the class period as safe and non-defective. As noted above, common evidence can be used to establish that the rear-mounted fuel tanks are unsafe because they are not sufficiently protected in rear-impact collisions (with or without FCA's trailer hitch remedy). In fact, the record includes FCA's own admissions during the course of NHTSA's defect investigation and subsequent safety recall that the fuel tanks on the Jeep Vehicles have "a small chance of experiencing a fuel leak during certain types of rear end collisions," which "in the presence of an ignition source [a fuel leak] can result in an underbody fire"; FCA further admits that this safety hazard exists in 100% of the vehicle population, and has unsuccessfully attempted to resolve the hazard with a recall program to install a trailer hitch assembly on the vehicles. (Arndt Decl., Ex. 1, ¶¶ 15(d)-(e), 16(a)-(i).) In similar circumstances, courts have recognized that "by providing classwide relief through its notice and repair program, [a vehicle manufacturer] has acknowledged that a single class defect exists." Edwards v. Ford Motor Co., 603 Fed. App'x 538, 541 (9th Cir. 2015).

The existence of a common defect in the Jeep Vehicles is sufficient for the Court to find that predominance is satisfied in this case. Indeed, numerous other courts in vehicle defect cases have reached this same conclusion. Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1173 (9th Cir. 2010) ("Common issues predominate such as whether Land Rover was aware of the existence of the alleged defect, whether Land Rover had a duty to disclose its knowledge and whether it violated consumer protection laws when it failed to do so."); Falco v. Nissan N. Am., Inc., No. 13-00686 DDP (MANx), 2016 WL 1327474, at *8 (C.D. Cal. Apr. 5, 2016) ("[T]he evidence cited by Plaintiffs in their moving papers is sufficient at this stage of the case to make out allegations common among the class as to the alleged vehicle defects, the effects the alleged

defects could have on the vehicle in terms of safety, and Nissan's knowledge of the defect. Therefore, common issues predominate."); Sanchez-Knutson v. Ford Motor Co., 310 F.R.D. 529, 538 (S.D. Fla. 2015) (predominance satisfied when "Plaintiff has submitted sufficient evidence . . . that the exhaust contamination in her Explorer is the result of a systemic problem caused by a combination of design and manufacturing defects").[3] These cases are consistent with the Eighth Circuit's holding in Zurn Pex that a theory of "universal and inherent product defect" satisfies the predominance test because it is amenable to class-wide resolution based on common evidence. Zurn Pex, 644 F.3d at 619.[4]

With a single, uniform defect in the fuel tanks of the Jeep Vehicles, it is easy for a jury to then determine based on common evidence whether FCA misrepresented those vehicles as safe and non-defective. The misrepresentations at issue began at the start of the class period and were made to the general public in press releases and media statements, meaning that they are the same for each and every member of the class. As noted above, these general statements are sufficient to trigger liability, regardless of whether any individual class member saw or relied on

---

[3] See also Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 534 (C.D. Cal. 2012) ("[A] violation of the [California consumer protection statute] can be proved with common evidence regarding the nature of the design defect in question, the likely effect of the defect on class vehicles, its likely impact on vehicle safety, what Honda knew or did not know, and what it disclosed or did not disclose to consumers. Consequently, the court concludes that plaintiffs have satisfied the predominance requirement with respect to their . . . claim."); Klee v. Nissan N. Am., Inc., No. CV 12-08238 AWT (PJWx), 2015 WL 4538426, at *4 (C.D. Cal. July 7, 2015) ("The court finds that common factual issues predominate because class members' claims hinge on their assertion that the LEAF batteries are defective and that defect was not properly disclosed to consumers."); Henderson v. Volvo Cars of N. Am., LLC, No. 09-4146, 2013 WL 1192479, at *6 (D.N.J. Mar. 22, 2013) ("Class Members share common questions of law and fact, such as whether Volvo knowingly manufactured and sold defective automobiles without informing consumers. . . . Evidence in the record supports the conclusion that common questions predominate over individual questions particular to any putative Class Member.").

[4] Numerous other non-vehicle cases find that predominance is satisfied and class certification is appropriate on the theory of a uniform product defect. See, e.g., Butler v. Sears, Roebuck & Co., 727 F.3d 796, 801 (7th Cir. 2013); Nieberding v. Barrette Outdoor Living, Inc., 302 F.R.D. 600, 611-16 (D. Kan. 2014).

the statements, because reliance and transaction causation are not required under the MMPA. See, e.g., Plubell, 289 S.W.3d at 714 ("Both our case law and the governing regulations make clear that the consumer's reliance on an unlawful practice is not required under the MMPA."; "The MMPA does not require that an unlawful practice cause a 'purchase.'"); Stephens v. Arctic Cat Inc., No. 4:09CV02131 AGF, 2012 WL 628867, at *4 (E.D. Mo. Feb. 27, 2012) ("Under the MMPA a plaintiff need not prove that he relied on the acts or omissions complained of or that they induced the sale or purchase.").

Numerous decisions of Missouri courts in MMPA cases have found that this single, overarching question – the legality of the defendants' conduct – is more than sufficient to satisfy the predominance requirement for class certification. Janson, 271 F.R.D. at 512 (predominance satisfied for MMPA claim because common questions regarding defendants' conduct and whether that conduct violated Missouri law "pervade each claimant's case"); Hopkins, 265 F.R.D. at 488-89 ("Common questions of law and fact predominate Plaintiffs' claims under the MMPA" because "[e]ach class member may attempt to prove Defendant engaged in an unfair practice in violation of the MMPA through use of . . . common evidence."); Glen v. Fairway Indep. Mortg. Corp., 265 F.R.D. 474, 481 (E.D. Mo. 2010) (predominance satisfied "because the primary issue in this case involves the legality of defendant's conduct [under the MMPA]"); Hope v. Nissan N. Am., Inc., 353 S.W.3d 68, 84 (Mo. Ct. App. 2011) (predominance satisfied because "MMPA claims rely only on evidence regarding [defendant's] conduct, which is common to the class as a whole"); Plubell, 289 S.W.3d at 713 (predominance satisfied because "the legality of Merck's conduct . . . is common to all the Missouri class members, and because that issue is at the core of the case"); Dale v. DaimlerChrysler Corp., 204 S.W.3d 151, 176 (Mo. Ct. App. 2006) (predominance satisfied when "the same evidence would suffice for proposed class members . . . to make a prima facie case [under the MMPA] as to the issue of whether the

installation of a Bosch motor would be the only fix with respect to the alleged defective power window regulators of the [class vehicles] in question.").[5]

The issue of FCA's liability for violation of the MMPA can be resolved on a class-wide basis using common evidence of the Jeep Vehicles' safety defect and FCA's misrepresentation of that defect. And because the class members' MMPA claims do not involve individualized issues such as knowledge, reliance and intent, it is clear that the common issue of FCA's liability will satisfy the predominance requirement.

### ii. Common Issues of Damages are Predominant in this Case

The predominance of common issues in this case is furthered strengthened by the fact that Plaintiff seeks to recover for uniform economic loss to all class members through a benefit of the bargain model of damages, which is "applicable in MMPA cases to meet the element of ascertainable loss" and "compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." Plubell, 289 S.W.3d at 715. This model is well--suited for certification because it does not measure individual out-of-pocket expenditures, but reflects an "objectively ascertainable loss" across the entire class. Hope, 353 S.W.3d at 84.

---

[5]     Other federal courts faced with motions to certify class actions based on MMPA claims have similarly determined that the absence of individualized elements such as reliance and causation weighs heavily in favor of class certification. See, e.g., In re Dial Complete Mktg. & Sales Practices Litig., 312 F.R.D. 36, 68-69 (D.N.H. 2015) (rejecting assertions of individual issues and certifying MMPA class action based on determination that "[an] MMPA claim is capable of classwide proof"); In re Celexa & Lexapro Mktg. & Sales Practices Litig., MDL No. 09-02067-NMG, 2014 WL 108197, at *7 (D. Mass. Jan. 10, 2014) ("Because reliance and causation are not elements of a claim under the MMPA, there will be no need for individualized findings in either respect and common issues will therefore predominate."); In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2011 WL 3268649, at *5 (N.D. Cal. July 28, 2011) (certifying MMPA class action because "questions of law or fact common to the proposed Missouri class members predominate over any questions affecting only individual class members"); Krause v. GE Capital Mortg. Servs., Inc., No. 97 C 8589, 1998 WL 831896, at *5-6 & n.10 (N.D. Ill. Nov. 20, 1998) (noting that "the MMPA does not require proof of reliance" and certifying MMPA class action because "common issues of law and fact are likely to predominate over individual issues of law and fact").

In the case of an alleged misrepresentation of a defective vehicle, Missouri courts hold that the cost of repair to bring the vehicle into conformance with the representation is the proper measure of damages. Morehouse v. Behlmann Pontiac-GMC Truck Serv., Inc., 31 S.W.3d 55, 61-62 (Mo. Ct. App. 2000); Viene v. Contour Motor Auto Sales, Inc., 787 S.W.2d 814, 815-16 (Mo. Ct. App. 1990); see also Brown v. Bennett, 136 S.W.3d 552, 557 (Mo. Ct. App. 2004). Citing Morehouse and Brown, this Court previously confirmed that repair-cost damages are viable under the benefit of the bargain rule, stating that they "are a valid alternative to diminution in value damages under the MMPA." (Order Clarifying Denial of Remand, Doc. #87, at 6.) For vehicle misrepresentations, repair cost fits within the rubric for assessing benefit of the bargain damages because it goes to the difference between "the value of the car as represented and its actual value." Lindberg Cadillac Co. v. Aron, 371 S.W.2d 651, 653-54 (Mo. Ct. App. 1963).

In this case, there is substantial evidence to support the claim that FCA's attempted recall remedy of installing a trailer hitch on the Jeep Vehicles did not resolve the safety defect inherent in the insufficiently protected rear-mounted fuel tanks. Mr. Arndt's Declaration identifies a fuel tank shield/skid plate remedy that could be applied uniformly to all Jeep Vehicles and would allow those vehicles to conform to FCA's representations of safety and non-defectiveness by encapsulating the fuel tank and providing "improved protection for the fuel tank against puncture and leaking in rear-impact collisions." (Arndt Decl., Ex. 1, ¶ 17(b).) The materials referenced in and attached to Mr. Arndt's Declaration (including the Supplemental Declaration of Lawrence Brookes, FCA's Head of Product Analysis and Regulatory Processes) indicate that the cost of the shield/skid plate remedy can be uniformly determined for the class members. (Id. ¶ 17(e).) This uniform recovery further supports class certification.

FCA has argued repeatedly that Plaintiff and other Missouri consumers have not suffered an ascertainable loss, and are not injured under the MMPA, because their vehicles have not

exhibited the defect in question.  This argument ignores the nature of the alleged defect, which is actionable because it already exists in the insufficiently protected rear-mounted fuel tanks of <u>all</u> Jeep Vehicles that comprise the proposed class.  <u>See</u> <u>Zurn Pex</u>, 644 F.3d at 617 (distinguishing "no injury" claims involving products that are only at risk of developing a defect from claims based on an "inherent universal defect" that already exists in all of the subject products).  As the Eighth Circuit stated in <u>Zurn Pex</u>, a product user does not "have to be injured by [the product in question] for a defect to manifest."  <u>Id.</u>  Here, the owners of inherently defective Jeep Vehicles do not have to perish in fiery rear-impact collisions before they can claim damages incurred in purchasing the misrepresented vehicles.  The cost of an effective repair is an immediately viable measure of damage for all class members because it is "measured at the time of the transaction." <u>Larabee v. Eichler</u>, 271 S.W.3d 542, 548 (Mo. 2008).

In any event, even with only a "risk" of defect manifestation, Plaintiff and all other class members would still have viable claims because the MMPA's governing regulations provide that an "unfair practice" is actionable under the statute if it "[p]resents a **<u>risk</u>** of, or causes, substantial injury to consumers."  Mo. Code Regs. Ann. tit. 15 § 60-8.020(1)(B) (emphasis added).  Taking stock of the case law on this issue, the federal district court presiding over the General Motors ignition switch litigation recently rejected the same argument made by FCA, holding as follows:

> New GM argues, though, that the Missouri Plaintiffs' MMPA claims fail because none of their cars manifested a defect. . . .
>
> [M]any other cases have recognized MMPA claims even without a manifested defect, often on a "diminution-in-value" or "benefit-of-the-bargain" theory of the sort pressed here.
>
> Although the question is a close one, the Court concludes that the balance of authority weighs slightly in favor of Plaintiffs' view that Missouri law recognizes the benefit-of-the-bargain defect theory and does not require "manifestation" of a defect to bring a claim such as the one here.  Among other things, many of the cases appearing to require a plaintiff to show a manifest defect seem to be driven by skepticism that the products at issue were even defective at all. . . . Notably,

the BPA Court distinguished Briehl on precisely these grounds, stating that whereas in Briehl there had been "only a potential that a person's brakes would be misused" in the case before it, "there is not merely a potential for BPA being in the products—there is no doubt that BPA was present." As in BPA, the [complaint] alleges that the defects here were present in the Missouri Plaintiffs' cars at the time of sale—they just did not cause any problems while the plaintiffs were driving the cars.

In re Gen. Motors LLC Ignition Switch Litig., 14 MD-2543 (JMF), 2016 WL 3920353, at *33-34 (S.D.N.Y. July 15, 2016).

Missouri law does not require manifestation of a defect to support recovery under the MMPA, and even if did, many courts have rejected the notion that a manifestation requirement precludes class certification. See Wolin, 617 F.3d at 1173 ("[W]e have held that proof of the manifestation of a defect is not a prerequisite to class certification."); see also Sharma v. BMW of N. Am, LLC, No. C-13-2274 MMC, 2015 WL 82534, at *1 (N.D. Cal. Jan. 6, 2015) ("[I]n an automobile design defect class action, the named plaintiff is not required, even at the class certification stage, to establish that the defect manifested itself in all class vehicles; rather, evidence pertaining to manifestation pertains to the 'merits' of the class claims.").

The cost of repair model of damages in this case is viable as a matter of Missouri law on Plaintiff's theory of liability under the MMPA, and it satisfies the predominance requirement of Rule 23(b)(3) because it "is consistent for all class members." Carriuolo v. Gen. Motors Co., 823 F.3d 977, 989 (11th Cir. 2016); see also Sanchez-Knutson, 310 F.R.D. at 538 (finding that predominance was satisfied by "straight arithmetic damages model" that used cost of repair "as a proxy for the amount of overpayments, i.e., what amount of money would have theoretically made Plaintiff whole at the time of purchase or lease of a vehicle with the allegedly dangerous or defective condition."). In these circumstances, the Court should find a predominance of common issues and grant certification of the proposed class of Missouri consumers.

## B. The Class Action Mechanism Is the Superior Method for Adjudication of the Claims in this Case

"Many courts have held that class actions are superior to a potential flood of duplicative individual lawsuits on efficiency grounds." 2 William B. Rubenstein, <u>Newberg on Class Actions</u> § 4:67 (5th ed. 2012). This is true for MMPA cases in particular. <u>Janson</u>, 271 F.R.D. at 512 ("If all potential class members filed separately, there would be thousands of individual actions each relying on identical conduct by [defendant] and each asserting small claims. Given the large number of potential plaintiffs and the commonality of their claims, certifying the class will allow a more efficient adjudication of the controversy than would individual adjudications.").

Rule 23(b)(3) outlines four factors for the Court's consideration in addressing the superiority requirement.[6] These factors and others strongly favor the class action mechanism in this case. Because Plaintiffs satisfy the typicality and adequacy elements of Rule 23(a), they are presumptively competent class representatives and there is no apparent reason why any putative class member would have a contrary interest in pursuing individual litigation. No other Missouri consumer is known to have initiated similar MMPA claims against Defendants, and the rights of the putative class members may go unprotected but for the prosecution of this case as a class action. This Court is a logical and natural forum for the class action (which is comprised entirely of Missouri consumers asserting claims under Missouri law), and there are no apparent manageability concerns with class litigation in this case.

In addition, and perhaps most importantly, the MMPA itself expressly sanctions the class action procedure in cases where a defendant's alleged unlawful practice "has caused similar

---

[6] These factors include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

injury to numerous other persons."  Mo. Rev. Stat. § 407.025.2.  As detailed above, Plaintiff's

MMPA claim against FCA here is similar in character to the claims that have been certified by

numerous other federal and state courts.  Like those cases, the class action procedure is the

superior method for adjudicating the MMPA claim brought by Plaintiff in this lawsuit on behalf

of himself and the thousands of Missouri consumers who have suffered economic injury from the

purchase of the misrepresented Jeep Vehicles.  Glen, 265 F.R.D. at 482 ("I agree with plaintiffs

that class-action treatment is the superior method for resolving these controversies because they

involve only Missouri plaintiffs, each with relatively small [MMPA] claims, who might not

otherwise seek or obtain relief absent a class action.").

### C.    The Proposed Class in this Case is Properly Defined With Reference to Objective Criteria and is Clearly Ascertainable

Rule 23(c)(1)(B) provides that an order certifying a class action "must define the class."

In this regard, the Eighth Circuit has said that "[i]t is elementary that in order to maintain a class

action, the class sought to be represented must be adequately defined and clearly ascertainable."

Sandusky, 821 F.3d at 996.  Courts in this District applying Sandusky have noted that it "did not

apply any heightened ascertainability standard as advocated by the defendant there.  Nor did it

examine, or even mention, factors of standing or administrative feasibility in connection with

ascertainability."  Labrier, 2016 WL 4005998, at *5; Lafollette, 2016 WL 4083478, at *5.

In practice, "[t]he class definition must enable the Court to determine who is in the class,

and thus, who is bound by the ruling."  Glen, 265 F.R.D. at 477.  A class definition is proper for

certification if it is "drafted in such a way to ensure that membership is ascertainable by some

objective standard."  Walls v. Sagamore Ins. Co., 274 F.R.D. 243, 250 (W.D. Ark. 2011).  Here,

the proposed class includes all current owners of Jeep Vehicles who purchased their vehicles in

Missouri since June 4, 2013 (when FCA began making its public misrepresentations about the

vehicles) and whose vehicles were not equipped with a fuel tank shield/skid plate at the time of purchase (i.e., the remedy identified by Plaintiff's expert that would allow the Jeep Vehicles to conform with FCA's representations of safety and non-defectiveness). This proposed definition properly creates objective criteria for class membership in terms of what was purchased, where a purchase was made, and when a purchase was made. See Janson, 271 F.R.D. at 513.

Although feasibility is not a requirement identified in Sandusky, Judge Laughrey noted in Labrier that when a "company's records contain the objective information necessary to identify class members . . . , courts routinely conclude class certification is appropriate . . . ." Labrier, 2016 WL 4005998, at *10. Here, the evidence demonstrates that class members can be easily identified by reference to FCA's corporate records. In the remand proceedings, FCA submitted the Declaration of Lawrence Brookes, which indicates that FCA is able to determine from its records a precise number of vehicles that have been purchased by individuals in Missouri during the class period. (Brookes Decl., Ex. 2, ¶¶ 3-4.)

The documents produced by FCA in discovery also show that it maintains Vehicle Owner Information Reports and Vehicle Information Detail Reports from which it is able to identify vehicle owners and determine the build specifications of particular vehicles. Exemplar copies of these reports are attached as **Exhibit 7**. The Sales Codes listed in the Vehicle Information Detail Report correspond to certain equipment installed on the vehicles, which allows for identification (and elimination) of vehicles already equipped with fuel tank shields/skid plates using a simple cross-reference of the Sales Codes that include those parts – namely, Sales Codes ADL, AWN and XEE for the Jeep Grand Cherokee vehicles, and Sales Codes ADL and XEE for the Jeep Liberty vehicles. These Sales Codes are discussed in FCA's submission to NHTSA in the course of the recall, and excerpts of that submission are attached as **Exhibit 8**. From this evidence, it is feasible to determine who is included in the class.

**Conclusion**

Plaintiff's MMPA claim in this case is virtually identical to the MMPA claims and other vehicle-defect claims that have been certified as class actions in numerous other cases. Missouri consumers who purchased the Jeep Vehicles misrepresented by FCA have all suffered uniform financial injury because the vehicles are not the "safe" and "non-defective" vehicles represented by FCA, but, instead, require further repairs to make them so. Plaintiff submits that the Court should certify this case as a class action for purposes of litigating the MMPA claim against FCA on behalf of the following class:

> All current owners of a Model Year 2002-2007 Jeep Liberty vehicle or a Model Year 1993-1998 Jeep Grand Cherokee vehicle that was not equipped with a fuel tank shield/skid plate at the time of purchase, who purchased the vehicle in the State of Missouri for personal, family or household purposes at any time from June 4, 2013 to the present.

Respectfully submitted,

SHANK & MOORE, LLC

By:  /s/ Stephen J. Moore
       Christopher S. Shank    MO #28760
       David L. Heinemann    MO #37622
       Stephen J. Moore      #KS-000827
       1968 Shawnee Mission Pkwy, Suite 100
       Mission Woods, Kansas 66205
       Telephone:   816.471.0909
       Facsimile:    816.471.3888
       chriss@shankmoore.com
       davidh@shankmoore.com
       sjm@shankmoore.com

*Attorneys for Plaintiff David Faltermeier*

<u>**CERTIFICATE OF SERVICE**</u>

      The undersigned attorney hereby certifies that the foregoing document was filed this 22nd day August, 2016, via the Court's CM/ECF system, which shall send electronic notice of the same to the following counsel of record:

      <u>**Counsel for Defendant FCA US LLC**</u>
Kathy A. Wisniewski
Sharon B. Rosenberg
Stephen D'Aunoy
Scott H. Morgan
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101


            _/s/ Stephen J. Moore_
            Attorney for Plaintiff