UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DAVID FALTERMEIER, on behalf of himself and all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | Case No. 4:15-cv-00491-DGK |
| vs. ) ) | |
| FCA US LLC, ) ) | |
| Defendant. ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

This is a putative class action arising from alleged violations of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020. Plaintiff David Faltermeier alleges that Defendant FCA US LLC ("FCA") made misrepresentations during a vehicle safety recall that have caused Plaintiff and all other consumers who have purchased the recalled vehicles since June 4, 2013, an ascertainable financial loss.

Now before the Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 66) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons listed below, the motion is GRANTED IN PART and DENIED IN PART.

### Background[1]

In 2009, FCA purchased assets and liabilities, including those associated with vehicle safety recalls, from Chrysler LLC, the company that manufactured Jeeps. In August of 2010, the Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration

---

[1] As discussed below, the standards for review under Rule 12(b)(1) and (6) differ. Because a majority of FCA's arguments for dismissal fall under the 12(b)(6) standard, the facts in this background section are pulled from the Amended Complaint and assumed to be true, except where noted. *See Data Mfg. Inc. v. UPS, Inc.*, 557 F.3d 849, 851 (8th Cir. 2009). The facts surrounding FCA's argument for dismissal under Rule 12(b)(1) are outlined in the Court's discussion, *infra* pp. 6-8.

1

("NHTSA") ordered a preliminary evaluation of alleged defects[2] in Model Year 1993-2004 Jeep Grand Cherokee vehicles. Pl.'s First Am. Compl. ("Am. Compl.") ¶ 12 (Doc. 65). In June of 2012, this investigation was expanded to include both Model Year 1993-2004 Jeep Grand Cherokee vehicles and Model Year 2002-2007 Jeep Liberty vehicles (collectively, the "Jeep Vehicles"). *Id.* In June of 2013, the NHTSA requested that FCA perform a safety recall of the Jeep Vehicles. *See id.* ¶¶ 13, 25, 26; June 3, 2013, NHTSA Recall Letter, Am. Compl. Ex. A (Doc. 65-1). FCA agreed to perform a safety recall of the Jeep Vehicles and offered to install a trailer hitch to remedy the defect. *Id.* ¶ 25. Over the course of the next two years, the NHTSA criticized FCA's response to the safety recall request.[3] *Id.* ¶¶ 27-31. On July 2, 2015, the NHTSA held a public hearing to gather evidence regarding deficiencies in FCA's safety recall performance. *Id.* ¶¶ 30-31. Following this hearing, the NHTSA entered into a consent order requiring FCA to perform a vehicle buyback campaign and pay a $105 million civil penalty. *Id.* ¶ 32.

In August of 2013—in the midst of the NHTSA and FCA recall efforts—Plaintiff David Faltermeier purchased a 2003 Jeep Liberty for personal use from a third party for $4,900. *Id.* ¶ 5. Plaintiff maintains FCA has consistently and affirmatively misrepresented the design, safety, and performance of Jeep Vehicles from June 4, 2013, to the present. *Id.* ¶ 33. Specifically, Plaintiff cites to a June 4, 2013, press release and a June 18, 2013, press release ("the Press Releases"). *Id.* The June 4, 2013, press release reads in relevant part:

---

[2] The defect at issue involves the fuel tank design of the vehicles. According to the Amended Complaint, "vehicle designs incorporating fuel tanks located behind rear vehicle axles create an unreasonable risk of failure, fuel leakage and ignition in rear impact collisions." Am. Compl. ¶ 14. Due to this defect, "rear impact collisions can result in fiery crashes that are fatal to vehicle occupants who otherwise would have survived those collisions." *Id.*

[3] Specifically, the NHTSA Administrator expressed concerns about slow recall completion rates, slow or inadequate notifications to consumers regarding the recall, faulty remedies, and improper actions taken by dealers in connection with the recall. *Id.* ¶ 30.

NHTSA (National Highway Traffic Safety Administration) has issued a recall request letter proposing that Chrysler Group recall the Jeep Grand Cherokee in model years 1993 to 2004 and the Jeep Liberty in model years 2002 to 2007 (a total of approximately 2.7 million vehicles).

Chrysler Group has been working and sharing data with the Agency on this issue since September 2010. The company does not agree with NHTSA's conclusions and does not intend to recall the vehicles cited in the investigation. *The subject vehicles are safe and are not defective.*

We believe NHTSA's initial conclusions are based on an incomplete analysis of the underlying data, and we are committed to continue working with the Agency to resolve this disagreement.

'The safety of drivers and passengers has long been the first priority for Chrysler brands and that commitment remains steadfast,' said Sergio Marchionne, Chairman and CEO of Chrysler Group LLC. 'The company stands behind the quality of its vehicles. All of us remain committed to working with the NHTSA to provide information confirming the safety of these vehicles.'

Chrysler Group's position on this matter is clear.

These vehicles met and exceeded all applicable requirements of the Federal Motor Vehicle Safety Standards, including FMVSS 301, pertaining to fuel-system integrity. Our analysis shows the incidents, which are the focus of this request, occur less than once for every million years of vehicle operation. *This rate is similar to comparable vehicles produced and sold during the time in question.*

Chrysler Group stands behind the quality and safety of its vehicles. It conducts voluntary recalls when they are warranted, and in most cases, before any notice or investigation request from NHTSA.

Am. Compl. Ex. F (Doc. 65-6 at 2) (emphasis added); Am. Compl. ¶ 33(a).

FCA again falsely represented the Jeep Vehicles in a June 18, 2013, press release that

reads as follows:

Chrysler Group LLC and the National Highway Traffic Safety Administration (NHTSA) have resolved their differences with respect to NHTSA's request to recall 1993-2004 Jeep® Grand Cherokee and 2002-07 Jeep Liberty vehicles.

As a result of the agreement, Chrysler Group will conduct a voluntary *campaign* with respect to the vehicles in question that, in addition to a visual inspection of the vehicle will, if necessary, provide an upgrade to the rear structure of the vehicle to better manage crash forces in low-speed impacts.

3

> Chrysler Group's analysis of the data confirms that these vehicles *are not defective and are among the safest in the peer group.* Nonetheless, Chrysler Group recognizes that this matter has raised concerns for its customers and wants to take further steps, in coordination with the NHTSA, to provide additional measures to supplement the safety of its vehicles.
>
> Chrysler Group regards safety as a paramount concern and does not compromise on the safety of our customers and their families.
>
> Am. Compl. Ex. G. (Doc. 65-7 at 2) (emphasis added); *id.* ¶¶ 33(b), 34(b).

Plaintiff also contends Defendant made deceptive representations identified in an attached "white paper" prepared by the Center for Auto Safety ("White Paper"). *Id.* ¶¶ 21, 34(c)-(e), 35(a)-(c); *id.* Ex. B (Doc. 65-2). This White Paper contains a summary of responses to the NHTSA's request that Defendant recall the Jeep Vehicles. *See id.* Ex. B at 10. Plaintiff challenges several representations identified in the White Paper, including manipulations of crash data and misrepresentations of the proposed trailer hitch repair's effectiveness. *See* Am. Compl. ¶¶ 34-35; *id.* Ex. B at 1-4, 10. These alleged misrepresentations are summarized from the White Paper, and the Amended Complaint only specifically reproduces one quote from a former Chrysler executive regarding the trailer hitch's ineffectiveness. *See* Am. Compl. ¶¶ 34-35.

Finally, Plaintiff asserts that the alleged misrepresentations have been widely-disseminated to the general public through the national media. *Id.* ¶ 36. Several news articles from various outlets reported FCA's position that the vehicles were "not defective," "safe to drive," and did "not pose an unreasonable risk to safety." *Id.*

These misrepresentations have caused Plaintiff and the putative class members a financial loss. *Id.* ¶ 37. They were deprived of the benefit of the bargain when they purchased Jeep

4

Vehicles FCA represented as safe and non-defective, but were actually worth less than represented due to the defective, rear-mounted fuel tank design. *Id.*

On behalf of the class, Plaintiff seeks compensatory damages for a violation of the MMPA.

FCA now seeks to dismiss Plaintiff's suit under Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim.

## Standard

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if the court lacks subject matter jurisdiction. Where a party presents a factual attack on the court's jurisdiction, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (internal citations omitted); *see also Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005) ("Because jurisdiction is a threshold question, the court may look outside the pleadings in order to determine whether subject matter jurisdiction exists."). "The plaintiff will have the burden of proof that jurisdiction does in fact exist." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) (cited with approval in *Osborn*, 918 F.2d at 730).

Under Rule 12(b)(6), the court assesses whether the complaint pleads sufficient facts to state a claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the adequacy of a complaint, a court assumes the complaint's factual allegations are true and construes them in the light most favorable to the plaintiff. *Data Mfg. Inc. v. UPS, Inc.*, 557 F.3d 849, 851 (8th Cir. 2009). While courts will accept the plaintiff's factual allegations as true, a court must "reject

5

conclusory allegations of law and unwarranted inferences." *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997).

## Discussion

Defendant makes five arguments for dismissal: (1) Plaintiff's claim is an improper collateral attack of agency findings over which the Court lacks subject matter jurisdiction; (2) the alleged misrepresentations are protected communications; (3) Defendant committed no wrongful act "in connection with the sale or advertisement of any merchandise," and Defendant's statements did not cause Plaintiff harm; (4) the alleged misrepresentations are non-actionable opinions; and (5) Plaintiff does not have any "ascertainable loss of money or property."

### I. Plaintiff's claim is not an improper collateral attack of a "final agency action" regarding the adequacy of the trailer hitch remedy over which the Court lacks subject matter jurisdiction.

First, FCA asserts that the NHTSA found that the trailer hitch remedy provided by FCA under the recall has fixed the vehicles and made them safe to use, and this constitutes a final agency action that cannot be collaterally attacked via Plaintiff's lawsuit. In support of this argument, FCA provides a printout of a frequently asked questions page ("FAQ page") from safercar.gov, a website run by the NHTSA. Def.'s Br. Ex. B at 2 (Doc. 67-2). On the FAQ page, the NHTSA lists the options available to Jeep Vehicle owners and states that, if the owner has received the trailer hitch repair for their Jeep Grand Cherokee,[4] the car is safe to use. *Id.* at 3. FCA asserts that this finding was made after the Office of Defects Investigation of the NHTSA investigated FCA's trailer hitch remedy and determined it to be adequate.[5] In response, Plaintiff

---

[4] The FAQ page does not refer to the safety of any repairs made to Jeep Liberty vehicles. It specifically states the following regarding Jeep Grand Cherokee vehicles: "5. I responded to my recall notice and received the repair for my Jeep Grand Cherokee. Is my car safe to use? [Answer:] Yes." Def.'s Br. Ex. B at 3. The FAQ page further states that if the Grand Cherokee "has been remedied it is safe to use." *Id.*

[5] At the close of the ODI's investigation, the office issued a "Closing Resume." Pl.'s Br. Ex. 1 (Doc. 77-1). The Closing Resume indicates that—though the "ODI does not approve proposed defect remedies"—it "took the unusual

6

argues that these FAQ page statements do not constitute a "final agency action" to which the Administrative Procedure Act ("APA") applies, and this lawsuit is therefore not an impermissible collateral attack on such an action.

A final agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551(13). Such actions are "reviewable under the Administrative Procedure Act in an action against the [promulgating agency], but not subject to collateral attack through discovery or other means in individual lawsuits" against third parties. *Adams v. Resolution Trust Corp.*, 927 F.2d 348, 354 n.15 (8th Cir. 1991) (internal citations omitted). In the absence of a prior adjudication that the agency's action was arbitrary and capricious, a court lacks jurisdiction to hear a challenge to the agency determination. *Id.* at 354 & n.15; *see also Gaunce v. deVincentis*, 708 F.2d 1290, 1292-93 (7th Cir. 1983) (discussing the "well settled principle that collateral attacks upon administrative orders are not permissible" where Congress has provided a statutory procedure for the review of the administrative order, and finding that the court did not have subject matter jurisdiction to hear such a claim).

> The Supreme Court utilizes a two part test to determine whether an agency action is final for purposes of the APA: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."
>
> *In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 756 (8th Cir. 2003) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

---

step of requesting that NHTSA's Vehicle Research Test Center (VRTC) conduct crash reconstruction tests of actual crash incidents that were identified during the investigation to evaluate the [trailer hitch] remedy." *Id.* at 3. Following this investigation, the ODI concluded that "the Chrysler [trailer hitch] remedy will produce safety benefits sufficient to increase the fuel tank system integrity of the recalled vehicle population to a level similar to that of their peers." *Id.* at 3-4.

7

FCA cites *Snyder Computer Systems, Inc. v. United States Department of Transportation* for the proposition that an NHTSA statement regarding the adequacy of recall remedy repairs is a final agency action. 13 F. Supp. 3d 848 (S.D. Ohio 2014). At issue in *Snyder* was an NHTSA Recall Remedy Order finding that, following a voluntary recall, the vehicle importer's repairs to the vehicles were inadequate and failed to bring the vehicles into compliance with safety standards. *Id.* at 855-57. This order was issued following an investigation into the proffered repair, a notice-and-comment period, and a formal hearing. *Id.* at 854-55. The court and the parties agreed that the Recall Remedy Order was a "final agency action" subject to review under the APA. *Id.* at 859-60.

Here, however, the facts do not indicate that the FAQ page statement is the result of the same decisionmaking process present in *Snyder*. In the present case, the ODI initiated an investigation into the adequacy of the proposed trailer hitch repair, but—unlike in *Snyder*—these findings were not subject to either a notice-and-comment period or a formal hearing by the NHTSA before the FAQ page statements were published. Because the FAQ page statements do not mark the consummation of the NHTSA's decisionmaking process, they do not constitute a "final agency decision" for purposes of the APA.

Further, the ODI explicitly stated in its Closing Resume that it "does not approve proposed defect remedies." Pl.'s Br. Ex. 1 at 3 (Doc. 77-1). Thus, the ODI's own characterization of the defect remedy adequacy findings indicates that the ODI did not intend for them to be binding or for the determination to be one from which legal consequences would flow. Thus, the statements in the Closing Resume and the FAQ page do not constitute a "final agency action" under the APA.

8

Accordingly, Plaintiff's suit is not an improper collateral attack of a final agency action reviewable only in an action against the NHTSA under the APA, and FCA's motion to dismiss on this ground is denied.

## II.     The alleged misrepresentations are not absolutely privileged.

Next, FCA argues that all of the alleged misrepresentations fall under Missouri's absolute privilege for communications related to quasi-judicial proceedings. Plaintiff argues the doctrine is limited to defamation cases. Alternatively, Plaintiff contends the policies underlying the litigation immunity and the MMPA counsel against applying it here.

In Missouri, an absolute privilege is given "only in *limited* situations where there is a policy of permitting complete freedom of expression without inquiry into motives, including judicial, quasi-judicial, legislative or executive proceedings, and situations where the communication is provided for and required by law." *Barge v. Ransom*, 30 S.W.3d 889, 890 (Mo. Ct. App. 2000) (emphasis added); *see also State ex rel. McNary v. Hais*, 670 S.W.2d 494, 496 (Mo. 1984) (noting the actions of public administrative officers or bodies, who are required to investigate facts, hold hearings, and exercise discretion of a judicial nature, are considered to be quasi-judicial); *Drury v. Mo. Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558, 568 (Mo. Ct. App. 2008) (holding statements made during quasi-judicial proceedings are absolutely privileged if they are relevant to issues before the body). "The rationale undergirding this privilege is that the truth-seeking function at the heart of judicial proceedings requires absolute candor and a free exchange of views," values which outweigh the interest of an aggrieved party in protecting his reputation. *Pape v. Reither*, 918 S.W.2d 376, 381-82 (Mo. Ct. App. 1996).

On the other hand, due to "the [MMPA's] broad scope and the legislature's clear policy to protect consumers, certain legal principles are not available to defeat claims authorized by the

9

act." *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 725 (Mo. 2009) (disallowing application of the voluntary payment doctrine to defeat an MMPA claim where contrary to public policy). The MMPA has been recognized as broad, highly paternalistic legislation "designed to protect those that could not otherwise protect themselves." *Id.* at 727. It does not appear that Missouri courts have addressed whether the litigation privilege is available in the MMPA context.[6]

The proceedings surrounding the NHTSA investigation and safety recall are quasi-judicial in nature.[7] The issue is whether the interests underlying Missouri's litigation immunity outweigh the legislature's policy of protecting consumers under the MMPA.

The Court holds Missouri's policy of protecting consumers under the MMPA outweighs extending the litigation privilege to this case. Defendant argues the rationale underlying the litigation privilege—facilitating candor in the NHTSA investigations without the threat of liability—is furthered by barring claims based on FCA's statements made during the NHTSA investigation. But, the alleged misrepresentations here were made through public news outlets, in publicly-disseminated press releases, and, apparently, were communicated to the third-party Center for Auto Safety prior to the preparation of their White Paper. While absolute candor in an administrative investigation is important, the fact that at least some of these representations were

---

[6] Defendants cite cases in which this absolute privilege has been discussed outside the context of a defamation suit. However, these cases do not involve an MMPA claim. *See, e.g., Alternate Fuels, Inc. v. Cabanas*, 435 F.3d 855, 859 (8th Cir. 2006) (considering whether statement made in anticipation of administrative proceeding was entitled to absolute privilege in case alleging tortious interference); *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1105-06 (8th Cir. 1997) (applying absolute privilege to statements made by government official in a tortious interference case because a government official's statements would be covered by the immunity in the context of defamation suit); *Hallmark Cards, Inc. v. Monitor Clipper Partners*, 2010 WL 5129288, at *4-5 (W.D. Mo. 2010) (noting presence of absolute privilege in the context of a conspiracy claim).

[7] The parties do not dispute that the NHTSA proceedings were quasi-judicial.

10

aimed toward the public or third parties undermines FCA's argument.[8] Given the limited circumstances in which Missouri courts have awarded absolute immunity to statements made in judicial or quasi-judicial proceedings and the strong, clear legislative intent to broadly protect consumers underlying the MMPA, the Court declines to extend absolute immunity to the statements at issue in this case.

Defendant's motion to dismiss on this ground is denied.

### III. The alleged wrongful acts were committed "in connection with the sale or advertisement of any merchandise," and Plaintiff need not plead reliance to support his MMPA claim.

Next, FCA argues the alleged misrepresentations were not made "in connection with the sale or advertisement of any merchandise in trade or commerce" and that Plaintiff has failed to allege an injury "as a result of" the misrepresentations, as required by the MMPA. Mo. Rev. Stat. § 407.020.1. Plaintiff asserts the MMPA's reach is broad enough to encompass these misrepresentations and that he need not have relied on the misrepresentations to state a claim under the MMPA.

The MMPA "prohibits the use of the enumerated deceptive practices if there is a relationship between the sale of merchandise and the alleged unlawful action. According to the statute, the unlawful action may occur at any time before, during or after the sale and by any person." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. 2014). This does not require a direct contractual relationship between a plaintiff and a defendant. *See id.* at 416 ("Given the potentially broad scope of what is prohibited under the MMPA, it would seem incongruous to limit 'in connection with' to only apply to the original parties in a transaction."); *Gibbons v. J. Nuckolls, Inc.,* 216 S.W.3d 667, 669 (Mo. 2007) (finding that the phrase "any person" in the

---

[8] *Cf. Pape*, 918 S.W.2d at 381 (allowing a qualified judicial privilege in a defamation action for documents sent to a third party where the central concern of the letter, viewed in its entirety, was obtaining performance of the settlement agreement).

MMPA "does not contemplate a direct contractual relationship between plaintiff and defendant").

In this case, to state a claim, the Complaint must allege a relationship between the alleged misrepresentations and the Jeep Vehicle purchases. *See Conway*, 438 S.W.3d at 415. FCA publicly disseminated the Press Releases containing the alleged misrepresentations. Due to the nature of press releases, it can be reasonably inferred FCA expected the representations contained in those statements to reach current and future owners of Jeep Vehicles. *See Grabinski v. Blue Springs Ford Sales, Inc.*, 136 F.3d 565, 566 (8th Cir. 1998) (holding third party wholesaler liable for misrepresentations passed on to consumer through car salesperson because wholesaler expected the misrepresentations to be made to consumer). Though these statements were made in the course of a safety recall, a reasonable jury could conclude that FCA was aware future purchasers of Jeep Vehicles could rely on the statements in making their purchases. *See id.* at 569. Therefore, Plaintiff has sufficiently pled these alleged misrepresentations were made in connection with the sale of the Jeep Vehicles. FCA's motion to dismiss on this ground is denied.

FCA further contends, in multiple sections of the briefs, that Plaintiff has failed to allege any facts suggesting he relied on FCA's assertions in making his purchase. Missouri law "make[s] clear that the consumer's reliance on an unlawful practice is not required under the MMPA." *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009). This argument also fails.

### IV. FCA's specific denials of defect are more than mere puffery.

FCA next argues that all of the alleged misrepresentations are non-actionable opinions. Plaintiff contends the MMPA is much broader than other actions sounding in fraud, and FCA's statements are more than mere puffery.

A statement that amounts to puffery cannot serve as the basis for a claim under the MMPA. *Wright v. Bath & Body Works Direct, Inc.*, No. 12-00099-CV-W-DW, 2012 WL 12088132, at *2 (W.D. Mo. Oct. 17, 2012); *Hurst v. Nissan N. Am., Inc.*, No. WD 78665, 2016 WL 1128297, at *6-7 (Mo. Ct. App. Mar. 22, 2016) (applying puffery doctrine to MMPA claim). "Puffery has been defined as exaggerated statements of bluster or boast upon which no reasonable consumer would rely or vague or highly subjective claims of product superiority." *Wright*, 2012 WL 12088132, at *2 (internal quotations omitted). Comparative claims, often involving large numbers, have been held to constitute puffery "because a consumer cannot reasonably believe that there is a test behind the claim." *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1531 (E.D. Mo. 1997), *aff'd* 172 F.3d 623 (8th Cir. 1999). On the other hand, "[i]f a statement is a specific, measurable claim or can be reasonably interpreted as being a factual claim, i.e., one capable of verification, the statement is one of fact" and is actionable. *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004), *cited with approval in Hurst*, 2016 WL 1128297, at *9.

FCA explicitly denied the vehicles were defective in the Press Releases. Unlike the claims made in *General Motors*, these statements are specific, do not contain apparently inflated numbers, do not compare one product to another, and a consumer could reasonably believe there was a test behind the claims. *Cf. In re Gen. Motors Corp.*, 966 F. Supp. at 1531 (finding statements that brakes "are 99 percent more effective" than other safety devices and that a

13

"driver is 100 times more likely to benefit" from anti-lock brakes to be puffery, partially due to the large, inflated numbers used). The specific denials in the Press Releases—that "[t]he subject vehicles are safe and are not defective"—are capable of verification through investigation of the alleged defects and therefore do not constitute puffery. Accordingly, FCA's motion to dismiss is denied as it pertains to these specific denials of defect.

However, the statement that the Jeep Vehicles are "similar to comparable vehicles" in the June 4, 2013, press release is vague enough to constitute puffery. Further, FCA's statements that the recall was a "campaign" and that the vehicles "are among the safest in the peer group" in the June 18, 2013, press release are also vague and subjective statements constituting puffery. The Court grants FCA's motion to dismiss the MMPA claim as it relates to these specific statements.

### V. Plaintiff has alleged an "ascertainable loss of money or property."

Finally, FCA argues Plaintiff has failed to allege he has suffered an ascertainable loss of money or property, as required to state a claim under the MMPA. FCA asserts that the Jeep Vehicles' defect is unmanifested and Plaintiff has not suffered a cognizable injury. Plaintiff contends he and putative class members suffered an ascertainable loss when they paid more for their Jeep Vehicles than they were actually worth due to FCA's misrepresentations, and this is sufficient to plead a cognizable injury under the MMPA.

Under Missouri law, plaintiffs must show "they suffered pecuniary loss to prevail on their MMPA claim." *Grawitch v. Charter Commc'ns, Inc.*, 750 F.3d 956, 960 (8th Cir. 2014) (citing *Ward v. W. Cnty. Motor Co.*, 403 S.W.3d 82, 84 (Mo. 2013)). Missouri courts apply the benefit-of-the-bargain rule to determine whether there has been an ascertainable loss. *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 758 (W.D. Mo. 2015) (Whipple, J.) (citing *Sunset Pools v. Schaefer*, 869 S.W.2d 883, 886 (Mo. Ct. App. 1994)). This allows for a damages award of "the

14

Case 4:15-cv-00491-DGK   Document 143   Filed 09/13/16   Page 14 of 16

difference between the actual value of the property and what its value would have been if it had been as represented." *Id.* Under this rule, "Plaintiff need only allege that the actual value of the product as purchased was less than the value of the product as represented to state a claim for an ascertainable loss." *Id.* at 758-59. One measure of benefit-of-the-bargain damages is the cost of repairing the vehicle. *See Morehouse v. Behlmann Pontiac-GMC Truck Servs., Inc.*, 31 S.W.3d 55, 61-62 (Mo. Ct. App. 2000) (finding that repair invoices are sufficient evidence of damages in an MMPA claim).

Here, Plaintiff alleges that FCA's representations of the Jeep Vehicles as "safe" and "not defective" caused him to pay more for his car than it was worth because the vehicles all have an inherent defect—an insufficiently-protected plastic fuel tank. This is not a "potential" defect, and Plaintiff does not allege that he merely risks having the defect manifest itself in his vehicle. *Cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 617 (8th Cir. 2011) (finding, under Minnesota warranty law, that plaintiffs sufficiently alleged a cognizable injury where they argued a defect was "manifest" in the product and they did not merely risk having the defect manifest itself). Plaintiff must now bear the cost to bring his vehicle into conformance with FCA's representations regarding the fuel tank. Because Plaintiff sufficiently alleges he did not receive the benefit of the bargain in purchasing his vehicle, FCA's motion to dismiss on this ground is denied.

## Conclusion

Taking Plaintiff's factual claims as true, Plaintiff has stated a claim for which relief could be granted. Defendant's motion to dismiss is GRANTED with respect to MMPA claims as they relate to statements that are mere puffery. In all other parts, Defendant's motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: September 13, 2016 /s/ Greg Kays
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT