# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| DAVID FALTERMEIER, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:15-cv-00491-DGK |
| vs. | ) ) | |
| FCA US LLC, | ) ) | |
| Defendant. | ) | |

---

## FCA US LLC'S OPPOSITION
## TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

---

THOMPSON COBURN LLP
Kathy A. Wisniewski
kwisniewski@thompsoncoburn.com
Sharon B. Rosenberg
srosenberg@thomsoncoburn.com
Stephen A. D'Aunoy
sdaunoy@thompsoncoburn.com
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000

*Attorneys for FCA US LLC*

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  FACTS ...........................................................................................................1

   A.   The Pleaded Claim, FCA US LLC's Public Statements, And The Class. ........................1

   B.   Plaintiff, His Vehicles, And The Bases For His Own Claims. ........................................3

   C.   Plaintiff's Counsel. ...................................................................................................7

   D.   The Differences In The Jeep Vehicles. ......................................................................8

   E.   Plaintiff's Prosecution Of The Class Claim. ..............................................................12

III. ARGUMENT ....................................................................................................13

   A.   The Improper Class Definition. ...............................................................................13

   B.   Failure To Prove Numerosity. .................................................................................16

   C.   Lack Of Common Questions. ...................................................................................17

   D.   Lack Of Typicality. .................................................................................................18

   E.   Lack of Adequacy. ..................................................................................................20

   F.   Individual Questions Predominate. ..........................................................................23

        1.   Class Members Were Exposed To Differing "Representations". .........................23

        2.   Whether The Statements Were "In Connection With" A Sale Is An
             Individual Issue. ..........................................................................................24

        3.   The Requirement Of An "Ascertainable Loss" Is An Individual Issue. ...............25

        4.   Causation Cannot Be Proven By Common Evidence. ........................................27

        5.   The Issue Of "Defect" Is Not Common. ...........................................................28

   G.   A Class Action Is Not Superior. ...............................................................................29

IV.  CONCLUSION ..................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adashunas v. Negley,*
626 F.2d 600 (7th Cir. 1980) ............................................................15

*Am. Suzuki Motor Corp. v. Superior Ct. of Los Angeles Cty.,*
37 Cal.App.4th 1291 (1995) ............................................................30

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................23

*Blades v. Monsanto,*
400 F.3d 562 (8th Cir. 2005) ............................................................13

*Buzoiu v. Risk Mgmt. Alternatives, Inc.,*
2004 WL 1505061 (E.D.Pa. 2004) ............................................................22

*Carson P. ex rel. Forman v. Heineman,*
240 F.R.D. 456 (D.Neb. 2007)............................................................15

*Chin v. Chrysler Corp.,*
182 F.R.D. 448 (D.N.J. 1998)............................................................30

*Chochorowski v. Home Depot U.S.A.,*
404 S.W.3d 220 (Mo. banc 2013)............................................................27

*Chorosevic v. MetLife Choices,*
2007 WL 2159475 (E.D.Mo. 2007)............................................................17

*Daigle v. Ford Motor Co.,*
2012 WL 3113854 (D.Minn. 2012) ............................................................30

*Dumas v. Alberts Med. Inc.,*
2005 WL 2172030 (W.D.Mo. 2005) ....................................................13, 14, 23

*Faltermeier v. FCA US LLC,*
2016 WL 4771100 (W.D.Mo. 2016) ............................................................25

*Ford Motor Co. v. Magill,*
698 So.2d 1244 (Fla.App. 1997)............................................................30

*Glen v. Fairway Indep. Mortg. Corp.,*
265 F.R.D. 474 (E.D.Mo. 2010), *order clarified*, 2010 WL 891621............................................................28

- ii -

*Grodzitsky v. Am. Honda Motor Co.*,
    2014 WL 718431 (C.D.Cal. 2014)............................................................18

*Harris v. Union Elec.*,
    766 S.W.2d 80 (Mo. banc 1989)............................................................26

*Henke v. Arco Midcon, LLC*,
    2014 WL 982777 (E.D.Mo. 2014)......................................................16, 19

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996)..............................................................29

*In re BPA Polycarbonate Plastic Prods. Liab. Litig.*,
    276 F.R.D. 336 (W.D.Mo. 2011)............................................................22

*In re Ford Motor Co. Bronco II*,
    177 F.R.D. 360 (E.D.La. 1997)............................................................29

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
    174 F.R.D. 332 (D.N.J. 1997)..........................................................29, 30

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
    2007 WL 4287511 (N.D.Ill. 2007)..........................................................18

*In re St. Jude Med., Inc.*,
    425 F.3d 1116 (8th Cir 2005)..............................................................29

*In re St. Jude Med., Inc.*,
    522 F.3d 836 (8th Cir. 2008)..........................................................18, 27

*In re Stratosphere Corp. Sec. Litig.*,
    182 F.R.D. 614 (D.Nev. 1998)..............................................................20

*In re Tetracycline Cases*,
    107 F.R.D. 719 (W.D.Mo. 1985)............................................................15

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011)..............................................................13

*Janson v. Legal Zoom.com, Inc.*,
    271 F.R.D. 506 (W.D.Mo. 2010)............................................................19

*Katz v. Fiat/Chrysler Auto.*,
    2015 WL 2452419 (M.D.Pa. 2015)..........................................................30

*Kayes v. Pac. Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995)..............................................................21

- iii -

*Labrier v. State Farm Fire & Cas. Co.*,
2016 WL 4005998 (W.D.Mo. 2016), *appeal filed* ............................................................14

*Lafollette v. Liberty Mut. Fire Ins. Co.*,
2016 WL 4083478 (W.D.Mo. 2016), *appeal filed* ............................................................14

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012)................................................................................................16

*Martin v. Ford Motor Co.*,
292 F.R.D. 252 (E.D.Pa. 2013)...........................................................................................30

*Mayo v. USB Real Est. Secs., Inc.*,
2012 WL 4361571 (W.D.Mo. 2012) ....................................................................................13

*Moreno v. Autozone, Inc.*,
2007 WL 4287517 (N.D.Cal. 2007) .....................................................................................21

*Morgan v. UPS of Am., Inc.*,
169 F.R.D. 349 (E.D.Mo. 1996) ..........................................................................................20

*O'Shaugnessy v. Cypress Media, L.L.C.*,
2015 WL 4197789 (W.D.Mo. 2015) ....................................................................................21

*Perras v. H&R Block*,
789 F.3d 914 (8th Cir. 2015) ..............................................................................................13

*Plubell v. Merck & Co.*,
289 S.W.3d 707 (Mo.App. 2009) .........................................................................................27

*Prosser v. Avanti Petrol., Inc.*,
1999 WL 1116821 (E.D.Mo. 1999)......................................................................................21

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.*,
322 S.W.3d 112 (Mo. banc 2010)........................................................................................24

*Rigby Corp. v. Boatmen's Bank & Trust Co.*,
713 S.W.2d 517 (Mo.App. 1986) .........................................................................................24

*Saey v. CompUSA, Inc.*,
174 F.R.D. 448 (E.D.Mo. 1997) ..........................................................................................14

*Secreti v. PTS of Am., LLC*,
2015 WL 3505146 (M.D.Tenn. 2015)...................................................................................15

*Shiplet v. Copeland*,
450 S.W.3d 433 (Mo.App. 2014) .........................................................................................26

Case 4:15-cv-00491-DGK   Document 151   Filed 10/06/16   Page 5 of 38

*Smith v. Brown & Williamson Tobacco Corp.*,
    174 F.R.D. 90 (W.D.Mo. 1997)....................................................................................29

*State ex rel. Coca-Cola Co. v. Nixon*,
    249 S.W.3d 855 (Mo. banc 2008).........................................................................15, 16

*Stephens v. Arctic Cat, Inc.*,
    2012 WL 628867 (E.D.Mo. 2012)..........................................................................27

*Toben v. Bridgestone Retail Operations, LLC*,
    2013 WL 5406463 (E.D.Mo. 2013), *aff'd*, 751 F.3d 888 (8th Cir. 2014) ............23, 24, 25, 27

*True v. Conagra Foods, Inc.*,
    2011 WL 176037 (W.D.Mo. 2011) ........................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................*passim*

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) .................................................................................15


**Statutes**

49 U.S.C. § 30162.................................................................................................30

Missouri Merchandising Practices Act, Mo.Rev.Stat. § 407.020........................................*passim*


**Other Authorities**

Fed.R.Civ.P. 23...................................................................................................13, 20

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| **Exhibit A** | Deposition of David Faltermeier (June 7, 2016) |
| **Exhibit B** | Pl.'s Responses to Def.'s First Requests for Admission (Dec. 14, 2015) |
| **Exhibit C** | Pl.'s Answers to Def.'s First Set of Interrog. (Nov. 6, 2015) |
| **Exhibit D** | Deposition of Danielle Mitchell-Bush (July 12, 2016) |
| **Exhibit E** | Deposition of Mark Arndt (July 21, 2016) |
| **Exhibit F** | Pl.'s Second Supp. Answers to Def.'s First Set of Interrog. (June 27, 2016) |
| **Exhibit G** | Errata Sheet to Deposition of David Faltermeier (July 14, 2016) |
| **Exhibit H** | Faltermeier Dog Treat Claim Form Documents (Mar. 31, 2015) |
| **Exhibit I** | Nationwide Dog Treat Products Settlement Agreement [available at https://www.dogtreatproductssettlement.com] (as amended, Oct. 28, 2014) |
| **Exhibit J** | Declaration of Dan Crimmins (Oct. 6, 2016) |
| **Exhibit K** | Declaration of Sharon Rosenberg (Oct. 5, 2016) |
| **Exhibit L** | Expert Rpt. of David Harless & George Hoffer (May 4, 2016) |

# I.  INTRODUCTION

This Court has found that it is a "mischaracterization" of the claim brought by Plaintiff David Faltermeier to label it as one arising out of an alleged vehicle defect.  *See* Docket No. 52, p. 11.  In making this finding, this Court noted that Plaintiff's claim is actually about alleged "misrepresentations" made by Defendant FCA US LLC.  *Id.*  Yet, Plaintiff bases his argument that class certification is proper almost exclusively on the purported existence of a common "defect" in the vehicles at issue, and he ignores the multitude of individual issues that clearly prohibit certification of a class of vehicle owners seeking relief for alleged ***affirmative representations*** that were not directed specifically to them and which they may never have seen.

Plaintiff has not shown that he can meet any of the requisites for class certification. Accordingly, his motion should be denied.

# II.  FACTS

## A.    The Pleaded Claim, FCA US LLC's Public Statements, And The Class.

Plaintiff brings a single claim for violation of the Missouri Merchandising Practices Act, Mo.Rev.Stat. § 407.020 ("MMPA").  This claim is based on allegations that FCA US made false public statements that certain Jeep Vehicles are "safe and not defective" when the vehicles have a rear fuel tank that can puncture and result in a fire in a rear-end collision.  *See generally* First Amended Complaint ("FAC"), Docket No. 65.[1]  Plaintiff submits no evidence that FCA US ever disbursed this statement to the public at large or said it verbally or in writing to any specific consumer(s).  However, Plaintiff attaches to the FAC a copy of a June 4, 2013 press release issued by FCA US in which such a statement is contained.  *See* FAC at Ex. F.  Plaintiff provides

---

[1]The FAC contains allegations about other statements, but this Court has found that the only actionable statement is the one wherein FCA US allegedly stated that "the subject vehicles are safe and not defective."  *See* Docket No. 143, pp. 13-14.

no evidence that this statement was ever seen by anyone in the putative class other than himself (when his lawyer showed it to him). The single article printed in the immediate aftermath of that press release which is attached to the FAC does not contain the statement. *See* FAC at Ex. H.

Fourteen days after issuing a press release containing the statement that the Jeep vehicles were "safe and not defective" FCA US issued another press release. *See* FAC at Ex. G. In that press release, FCA US indicated that it had entered into an agreement with the National Highway Traffic Safety Administration ("NHTSA") to conduct a voluntary campaign related to the Jeep vehicles because it understood that its customers had "concerns" about the vehicles and thus would take additional measures to ensure the vehicles' safety. *Id.* Plaintiff submits no evidence as to when or where the statements in this press release were repeated, but he attaches to the FAC articles published on June 18, 2013 by Reuters New Agency and Huffington Post reporting the agreement had been made. *See* FAC at Exs. I, J. In the context of reporting the agreement, both articles indicated that FCA US had taken the position that the vehicles were not defective, but that NHTSA believed to the contrary. *Id.*

Periodically, over the course of the years after June 2013, the issue of the Jeep Vehicles' rear-mounted fuel tanks was the subject of other media stories. By way of example only, in March 2015 CBS aired and printed a detailed story about the Jeep Vehicles, noting that although FCA US initially rejected NHTSA's finding that there was a "defect," after a private meeting it "agreed to take action."[2] And, in an April 2015 New York Times article it was reported that a jury had returned a large verdict in a personal injury lawsuit involving a fire in a Jeep with a rear-mounted fuel tank, NHTSA was considering reopening the investigation into the Jeeps' rear-mounted fuel tanks, and that the level of consumer response to the 2013 recall

[2]*See, e.g.*, http://www.cbsnews.com/news/chrysler-jeep-recall-gas-tank-explosions-still-raising-safety-concerns/; *see also* FAC at Ex. K.

announcement had not been good. *See* FAC at Ex. L. The only statement in the article attributed to FCA US was that it was considering an appeal of the judgment in the legal case. *Id.*

Plaintiff now seeks certification of the following class based on the notion that the putative class members were "deceived" by FCA US's public statements about the Jeep vehicles:

> All current owners of a Model Year 2002-2007 Jeep Liberty vehicle or a Model Year 1993-1998 Jeep Grand Cherokee vehicle ["the Jeep Vehicles"] that was not equipped with a fuel tank shield/skid plate at the time of purchase, who purchased the vehicle in the State of Missouri for personal, family or household purposes at any time from June 4, 2013 to the present.

*See* Docket Nos. 65, 134.

**B.      Plaintiff, His Vehicles, And The Bases For His Own Claims.**

In August 2013 – ***two months after it was widely publicly reported that FCA US had reached an agreement with NHTSA to recall the Jeep Vehicles due to a risk that the rear-mounted fuel tanks in them could be compromised in a rear-end collision*** – Plaintiff purchased a 2003 Jeep Liberty which had been driven for approximately 150,000 miles. **Ex. A**, pp. 33-34. Although the "safe and not defective" statements had been made by FCA US before Plaintiff purchased his Liberty, he admits that he did not know of their existence until the spring of 2016 when his attorneys gave him a copy of the original Complaint and the statements were contained in an attachment to it (*i.e.,* in the press release). *Id.*, pp. 60, 62, 182-89, 191-99.[3]

Plaintiff did not conduct any research on any Jeep Liberty vehicle prior to his purchase. *Id.*, pp. 43-44. In fact, he did not read any representations at all about the Jeep Liberty or any of its qualities prior to purchase. *Id.*, p. 52.[4] At the time of purchase, Plaintiff was not aware of the recall FCA US had publicly announced related to the rear fuel tank in the Liberty. *Id.*, p. 65. All

---

[3] *See also* **Ex. B**, Nos. 29-42.

[4] *See also* **Ex. B**, Nos. 1-42; **Ex. C**, No. 4.

of the information told to Plaintiff by the salesperson was accurate. *Id.*, pp. 44-45, 52-54. Plaintiff's decision to purchase the Liberty had nothing to do with safety, but was, instead, based on the vehicle's looks and price. *Id.*, pp. 41-42. The seller was asking $5,300 or $5,700 for the Liberty, but Plaintiff negotiated the price down to $4,900. *Id.*, pp. 35-36. Plaintiff then handed cash to his friend Danielle Mitchell-Bush, and she completed the transaction without him, which is why only her name appears on the bill of sale. *Id.*, pp. 245; **Ex. D**, pp. 61-62. Plaintiff knew that the Liberty would have a "useful life" after which it would stop operating, and his intent was, and still is, to keep the vehicle for its entire useful life. **Ex. A**, pp. 96, 119, 254-55. Plaintiff uses the Liberty as his primary vehicle, even though he owns a second, newer car. *Id.*, pp. 34, 69, 85-86, 259-60. He has now driven the Liberty for 10,000 miles, without incident, and it is still in "excellent" condition. *Id.*, pp. 104-05, 118-19.[5]

Plaintiff has owned at least fifteen vehicles. *Id.*, pp. 36, 69, 70-72. He did not research any of them prior to purchase. *Id.*, pp. 43, 75-84, 86-87. At least two of the vehicles he has owned had side-mounted fuel tanks, and at least six had rear fuel tanks (including the Liberty). *Id.*, pp. 55-56, 100-02. The two with side-mounted fuel tanks were recalled because of "issues with side collisions," but Plaintiff did not undertake any repairs to address the issues and continued to drive the vehicles "all the time." *Id.*, pp. 88-90, 95. Plaintiff has built racecars, which most often involved putting the fuel tank in the rear. *Id.*, pp. 10-12.

Plaintiff is not accurate about which Jeep Vehicles are part of the class, and he does not know the difference between the different models. *Id.*, pp. 30-32. He does not understand the nature of this case, as he testified that his personal complaints are limited to "[t]he design and the placement of" the fuel tank, and he admitted that he has no other complaints about anything that

---

[5] *See also* **Ex. J**, ¶ 85.

FCA US said or did. *Id.*, pp. 120-21. He brought this lawsuit "to try to get Chrysler to provide a remedy with the fabrication of a shield to protect the gas tank." *Id.*

**Months after he purchased his Liberty**, in November or December of 2013, Plaintiff heard or saw news reports regarding Jeep rear fuel tanks, and at this point he learned from public sources that his Liberty was subject to a recall related to the rear positioning of its fuel tank. *Id.*, pp. 56-57, 65. After he "dug further into the news" to see "what all the fuss was about," he sent one of the articles he found to his counsel of record herein, with whom he had a pre-existing relationship. *Id.*, pp. 56-60, 161. The articles Plaintiff reviewed discussed the opposing views of NHTSA and FCA US regarding the safety of the rear-mounted fuel tanks in his Liberty, both before and after installation of the trailer hitch recall remedy. *Id.*, pp. 200-01, 204-09. Based on his review, Plaintiff understood there were "two sides to the story" and that he could choose to believe NHTSA's view that the Jeep Vehicles were not safe and had a defect, or FCA US's position that they were safe and had no defect. *Id.*, pp. 201-02, 205-06. Plaintiff eventually received written notice of the recall, and had the offered "trailer hitch" recall remedy installed on his vehicle in 2015. *Id.*, pp. 65-66, 173-74, 111-12. He opted to get the free recall remedy because he "thought it would help protect, in case of a rear end collision." *Id.*, pp. 112, 115.

Plaintiff knows that the free trailer hitch recall remedy provided to him decreased the safety risks associated with rear-end collisions,[6] but, **after he got the recall remedy (*i.e, subsequent to the filing of this lawsuit*)**, he decided this added free protection is "inadequate." *Id.*, pp. 67-68, 210-11. Despite getting a free remedy that made his vehicle safer than it was when he purchased it, Plaintiff claims he has benefit-of-the-bargain damages in the form of the

---

[6]Plaintiff's belief that the trailer hitch remedy provided added protection and safety for his vehicle is in accord with his own expert's testimony. **Ex. E**, pp. 112-13, 191.

money it would cost him to install a "skid plate" on it.  *See* FAC, ¶ 37; **Ex. C**, No. 7.[7]  Plaintiff has not, as of now, installed a skid plate on his vehicle; nor has he determined how much one will cost.  **Ex. A**, p. 256.  Plaintiff has never tried to sell his vehicle or value it.  *Id.*, pp. 119-20.

Plaintiff understands that he is seeking to represent a class, but he testified that he was not "more involved" and the actual "class action representative" until December 2015 or early 2016 (*i.e., months after the lawsuit was filed*).  *Id.*, pp. 141-42.  On an errata sheet, he changed this testimony to state that he knew in June 2015 that he was the class representative.  **Ex. G**. Plaintiff only wants to represent vehicle purchasers who, like him, did ***not*** read the alleged misrepresentations before purchasing a vehicle; he does ***not*** want to represent "individuals who would have read press coverage about the adequacy or inadequacy of the recall remedy before they purchased their vehicle."  **Ex. A**, pp. 161-62.  He knows that identifying who these purchasers are will require "sen[ding] out a questionnaire" or "asking them" individually.  *Id.*, p. 162.  Plaintiff also does ***not*** want to represent "people who have an informed belief" that the trailer hitch was an effective remedy, and he knows current owners would have to be individually questioned to determine whether they hold such a belief.  *Id.*, p. 152.  Who Plaintiff does want to represent are both individuals and businesses, including those who purchased vehicles already equipped with a skid plate because "we don't know where they got that skid plate, if it's something they made, or if it was by the manufacturer, the dealer, or if it's adequate."  *Id.*, pp. 147, 158-60.  He knows that an individual "visual inspection" of each vehicle would be necessary to determine who is in the class because "if you don't inspect it … you don't know 100 percent for sure if it was actually done correctly."  *Id.*, p. 160.  He admits "[t]here's a

---

[7]*See also* **Ex. F**, No. 4; Plaintiff's Memorandum in Support of Motion for Class Certification, Docket No. 135 ("Pl. Memo"), p. 10.

possibility" that after-market modifications of a vehicle "would affect the safety of the fuel tank," but he still believes that the owners of such modified vehicles should be in the class. *Id.*

C.  **Plaintiff's Counsel.**

Plaintiff first met his attorney of record in 2013, when he represented Plaintiff in making a claim against a class action settlement fund involving allegedly tainted dog treats. *Id.*, pp. 22-24; **Ex. G**. With his attorney's assistance, Plaintiff secured $13,326 from the class settlement fund. **Ex. A**, p. 25. This conflicted with the terms of the nationwide Settlement Agreement governing the fund, which provided that a class member could make a claim for reasonable economic damages supported by documentation, with a possible additional $300 *maximum* reimbursement for unsubstantiated expenses.[8]  *See* **Ex. I**. Plaintiff's counsel made a claim against the fund on Plaintiff's behalf for approximately $18,000 for veterinary expenses, a pet autopsy, cremation, and the cost of his pet and dog treats, but only $2,080 of the purported expenses were substantiated—meaning his *maximum* recovery should have been $3,080 ($2,650 autopsy costs + $130 cremation costs + $300 unsubstantiated expenses).[9] Plaintiff's counsel also represented him in a collection matter, which settled for less than the full amount of the judgment entered against him. **Ex. A**, pp. 229-31, 232-33. Plaintiff did not pay any attorneys' fees to his counsel for the dog treat case or the collection action. *Id.*, pp. 27, 231-32.

Plaintiff met with his counsel by telephone for fewer than 10 minutes to prepare for his deposition in this case. *Id.*, pp. 20-21. He does not believe that two of the three attorneys appearing for him in this case and seeking to be class counsel represent him, and he knows

---

[8]Plaintiff's claim form and payment check are attached hereto as **Exhibit H**.

[9]Additional questions are raised because the autopsy reported showing no indication of drugs or toxins, meaning it was entirely questionable whether the claimed expenses related to the allegedly tainted dog treats. *See* **Ex. I**.

absolutely nothing about them.  *Id.*, pp. 26, 136-37.  He does not know anything about ***any*** of the attorneys' qualifications to serve as class counsel.  *Id.*  He has a contingency fee arrangement under which his attorneys are to receive 40% of any recovery, and they must front costs which are to be reimbursed only out of a recovery.  *Id.*, pp. 28, 137.  Plaintiff testified at deposition that he signed a retainer agreement for counsel to represent him in this case in the spring of 2016, long after this case was filed.  *Id.*, pp. 134-35.  He later changed this testimony in an errata sheet indicating he retained counsel and signed an attorney fee agreement in April 2015.  **Ex.** G.

Plaintiff's counsel undertook the ***free*** representation of third-party witness and putative class member Danielle Mitchell-Bush[10] in the midst of this litigation, after FCA US subpoenaed her for deposition.  **Ex. D**, p. 45.  During her deposition, Bush changed her testimony after being coached by Plaintiff's counsel during a break.  *Id.*, pp. 36-37, 83-87, 91.  Specifically, during her deposition Bush testified about email communications she had with proposed class counsel, but after FCA US laid a foundation establishing the communications were not privileged a break in the proceedings was taken.  Bush returned to her deposition after the break and changed her testimony in a clear effort to create the appearance that the communications were privileged.  *Id.*

**D.    The Differences In The Jeep Vehicles.**

The Jeep Vehicles encompass two different vehicle models, spanning twelve different model years, whose total drawing-board-to-showroom-floor design and production time extends nearly thirty years.  *See generally* **Ex. J**.  There are significant differences not only from model-to-model, but also from model-year to model-year, and even among the same model and model-year based on mid-year changes or available options packages.  *Id.*  The number of variations in

---

[10]Bush is the one who actually purchased the Jeep Vehicle Plaintiff owns, and both of their names appear on the title for it.  **Ex. A**, pp. 245; **Ex. D**, pp. 61-62.

the vehicles themselves are overwhelming and too numerous to list here; however, an examination of even just **some** of these many differences is set forth below.[11]

**Tank & Vehicle Measurements.**  Plaintiff's own expert admits that "the proximity of the fuel tank to the rear bumper" is relevant to classifying the safety of the Jeep Vehicles, as this determines whether a vehicle is more or less susceptible to fuel leaking in a rear-impact collision. **Ex. E**, p. 144.[12]  And, he acknowledges that this proximity is measured by the distance between the aft-most point of the tank and the aft-most point of the bumper.  *Id.*  These measurements vary in the Jeep Vehicles from model-to-model, and from year-to-year.  **Ex. J**, ¶¶ 40-41.

Plaintiff's own expert also admits that a vehicle's center of gravity can be relevant to the safety of the Jeep Vehicles because it affects the "susceptibility to fuel leaking" in a rear-impact collision.  **Ex. E**, pp. 148-50.  Also, Plaintiff's own expert admits that whether the fuel tank extends "below the bumper" and "how it is actually attached to the vehicle," impacts the question of whether a rear fuel tank will deform in a collision, *i.e.,* the question of how safe it is. *Id.*, pp. 134-36.  These things vary greatly among the Jeep Vehicles.  **Ex. J**, ¶¶ 38-39.[13]

**Fuel Tank Walls & Tank Shape.**  Plaintiff's expert admits that, in assessing the type of critical safety issue presented by this case, fuel tank "materials" and construction matter because they affect whether a vehicle is "more or less vulnerable to fuel leaking in a collision."  **Ex. E**, pp. 131, 138.  Fuel tank construction, including wall thickness, differs among the Jeep Vehicles, as, for example, some of the Jeep Grand Cherokees had a single layer fuel tank, while others had a multi-layered fuel tank – a critical difference that Plaintiff's own expert concedes.  **Ex. J**, ¶¶

---

[11]A more complete (but far from exhaustive) list is included in the Declaration of FCA US engineer Dan Crimmins, attached hereto as **Exhibit J.**

[12]*See also* Pl. Memo, Ex. 1 (Arndt Rpt.), p. 10, ¶ 14(e).

[13]Plaintiff's expert did nothing to investigate these characteristics, *See, e.g.*, **Ex. E**, p. 88.

17-21; Pl. Memo at Ex. 1, p. 13, n.3. Even in the same model year, the construction of the tank (*i.e.,* the layers) could depend on the vehicle's emissions package. **Ex. J**, ¶ 21.

Plaintiff's expert also admits that "tank shape" will "definitely influence the ability of the tank to accommodate deformation" and "[t]he length to height ratio will influence the [] relationship between internal pressure and crush of the tank." **Ex. E**, p. 137. As Plaintiff's own expert concedes, the tank shapes were not the same in all the Jeep Vehicles. Pl. Memo at Ex. 1, p. 14, n.4; *see also* **Ex. J**, ¶¶ 22-24. These differences are compounded because, as Plaintiff's expert admits, some of the Jeep Vehicles could have aftermarket fuel tanks. **Ex. E**, p. 169.

Other "important" factors affecting the safety analysis admitted to by Plaintiff's expert are the tank's vapor space, and whether there is an "on-board refueling vapor recovery system." *Id.*, pp. 136-37, 164-65. As he concedes, these features differ in the Jeep Vehicles, even as between the same model of vehicles. Pl. Memo at Ex. 1, p. 14, n.4.; *see also* **Ex. J**, ¶¶ 25-30.

**_Underride, Ground Clearance & Ride Height._** Plaintiff's expert opines that "the potential for underride" – an "architectural mismatch" of vehicle structures such that in a rear-impact situation "the front of the striking vehicle goes underneath" the impacted vehicle – is relevant when assessing the safety risks presented by the fuel tanks. **Ex. E**, p. 94. As he admits, "the higher the ground clearance" of the rear-impacted vehicle relative to the striking vehicle "the greater the potential for underride," and the higher the bottom of the bumper "the more likely you will get underride." *Id.*, pp. 93-96, 145, 147.[14] In addition, he opined that "approach angle," "departure angle," "the architecture of the vehicles," and "the loading of the vehicle" are all relevant to determining ground clearance. *Id.*, pp. 93-97. All of these factors vary considerably in the Jeep Vehicles. **Ex. J**, ¶¶ 8-10, 42-48.

---

[14] *See also* Pl. Memo at Ex. 1, p. 10, ¶ 14(e); *id.* at p. 16, ¶ 16(d).

It is undisputed (because Plaintiff's expert admits) that aftermarket modifications can affect a vehicle's ground clearance and ride height (which, in turn, affects the safety assessment), as can a vehicle's wheel base. **Ex. E**, pp. 98, 147-48. Even without aftermarket modifications, various models and configurations of the Jeep Vehicles had varying wheelbases and weights. **Ex. J**, ¶ 48; *accord* **Ex. E**, p. 180. Only a vehicle-by-vehicle visual inspection could reveal these modifications. **Ex. J**, ¶ 46. Furthermore, as Plaintiff's expert admits, spring compression can affect ride height, and vehicle use affects the spring stiffness over time. **Ex. E**, p. 175.

**Fuel Tank Environment.** According to Plaintiff's expert, to evaluate which of two vehicles is more or less prone to a fuel leak in a rear-impact collision, one needs to assess the "environment in which that tank was located" and "[w]hat around it might puncture if it moves into the tank or the tank gets crushed by it," and such an evaluation requires "look[ing] at the closures in the tank, principally, the filler neck and fuel cap and how those designs are put together and how they are integrated into the containment system." *Id.*, p. 128. There are "literally hundreds and thousands of potential assaults" that must be considered, including tank straps, bolts, the shape or sharpness of bolts, and mounting brackets. *Id.*, pp. 140-42. Furthermore, the "geometry of the suspension" matters to the safety assessment. *Id.*, p. 143. The fuel tank environments in the Jeep Vehicles vary both across models and model-years, and even as to the same model and model-year due to mid-year changes. **Ex. J**, ¶¶ 29, 37-38, 49-54.

Moreover, according to Plaintiff's expert, "tank position is intertwined with other fundamental failure modes of fuel containment systems such that it's difficult, if not impossible, to discuss tank position without considering an array of other fuel system failure modes," in which fuel hoses, fillers, and caps are implicated. **Ex. E**, p. 132. Among other design differences involving these components, there was a significant mid-year change in the model-

year 2005 Jeep Liberty related to the filler hose-to-tank spud installation. **Ex. J**, ¶ 35.

**Protective Structures, Including The Skid Plate.** According to Plaintiff's expert, the presence of a trailer hitch matters to the safety assessment. **Ex. E**, pp. 112-13, 138-39, 200. Trailer hitches were an available option on some of the Jeep Vehicles, and aftermarket trailer hitches – which would vary in construction and thus affect the "rear impact" analysis differently – were readily available. *Id.*, pp. 191, 195. Plaintiff's expert also admits that a "skid plate"/"brush guard" matters to the safety analysis, that the thickness of such a component is relevant "in terms of maybe preventing crush, controlling displacement, and then lastly keeping things from coming in contact with the fuel tank." *Id.*, pp. 139-40. Factory-installed skid plates were available as part of options packages for the Jeep Vehicles, and, in addition, after-market skid plates were readily available. *Id.*, pp. 175-76, 226; *see also* **Ex. J**, ¶¶ 78-84. As Plaintiff's expert admits, it is reasonable to assume that a number of the Jeep Vehicles already had a skid plate when sold as used vehicles. **Ex. E**, p. 212. FCA US has no records indicating which of the Jeep Vehicles had skid plates when sold to putative class members, and thus the only way to make such a determination would be by an individual inspection of each vehicle. **Ex. J**, ¶ 82.

E.     **Plaintiff's Prosecution Of The Class Claim.**

Discovery opened in this case on August 28, 2015, but it was not until November 2015 that Plaintiff served his first set of written discovery, consisting of document requests only. *See* Docket Nos. 10, 25; *see also* **Ex. K**, ¶ 2. It was not until September 30, 2016—more than a year after discovery opened, and more than two months after the close of class discovery—that Plaintiff served his first and only set of interrogatories (totaling five). *Id.*, ¶ 3. During the class discovery phase, Plaintiff took no depositions of any witness, not even experts. *Id.*, ¶ 4. Plaintiff has not designated either an economic damages expert or a specific "skid plate" expert (either for class certification or trial), even though the cost of the latter is supposed to establish the former.

*Id.*, ¶ 5.   Moreover, although this case, at its heart, is supposed to be one about misrepresentations, Plaintiff did not designate any expert to establish the critical issues of dissemination of the representations, whether they reached any significant number of consumers, and/or whether they would matter to a consumer if they did.  *Id.*, ¶ 6.

The one expert Plaintiff did designate—to testify that the Jeep Vehicles are "defective"— admitted that the "basic starting point" of his opinions and report were a document prepared by Plaintiff's counsel that included what are "essentially the opinions and conclusions" he offers in this case.  **Ex. E**, pp. 35-36.  And, notably, Plaintiff missed his deadline to designate a merits expert, and had to seek relief from the Court after-the-fact to remedy this.  *See* Docket No. 96.

## III.  ARGUMENT

It is Plaintiff's burden to show that the class action requisites set forth in Rule 23 of the Federal Rules of Civil Procedure are satisfied:  numerosity; typicality; commonality; adequacy; predominance; and superiority.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011); *Blades v. Monsanto*, 400 F.3d 562, 569 (8th Cir. 2005).  He cannot satisfy his burden by relying on pleadings or simply declaring that the requisites are met; rather, he must present **evidence** demonstrating actual compliance.  *Dukes*, 564 U.S. at 350; *Perras v. H&R Block*, 789 F.3d 914, 916 (8th Cir. 2015).  Plaintiff does not meet these requirements here.

A.    **The Improper Class Definition.**

As this District has found, a proper class definition is a threshold matter for certification and requires that the class be "ascertainable" and "readily identifiable."  *See, e.g., Dumas v. Alberts Med. Inc.*, 2005 WL 2172030, *5 (W.D.Mo. 2005).   A class cannot include large numbers of uninjured class members.  *See, e.g., Mayo v. USB Real Est. Secs., Inc.*, 2012 WL 4361571, *6 (W.D.Mo. 2012).  This is because the law prohibits certification of a class that "contains members who lack standing."  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d

604, 616 (8th Cir. 2011). For this reason alone, certification here must be denied because an individual inquiry is necessary to determine which consumers: saw the allegedly actionable representations; when and in what context they saw them; and whether they have the required "injury-in-fact" traceable to FCA US's alleged misrepresentations.

In any event, Plaintiff is wrong when he suggests that defining a class using objective criteria is, in and of itself, sufficient to establish the legal sufficiency of a class definition; it is not. *See, e.g.*, *Dumas*, 2005 WL 2172030 at *5 ("the requirement that there be an identifiable class demands more than just an objective definition"). The class must be defined in such a way that "it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* In other words, the court must "be able to determine class membership without having to answer numerous fact-intensive inquires." *Id.* The class definition proffered by Plaintiff here does not meet these criteria because to be a class member it is not sufficient to simply be a "current owner" who purchased one of the Jeep Vehicles on or after June 4, 2013. *See* § II.A, *supra.* To be a class member, a Jeep Vehicle must also ***not*** have had a skid plate at the time of purchase, and it must have been bought for "personal, family or household purposes." *Id.* The only way to determine who purchased a Jeep Vehicle "without a skid plate," and what each person's purpose was in purchasing, is to conduct thousands of mini-trials. There are no records from which either of these criteria can be discerned.[15] *See* **Ex. J**, ¶ 82. And, notably,

---

[15]For this reason, Plaintiff's reliance on *Labrier v. State Farm Fire & Cas. Co.*, 2016 WL 4005998 (W.D.Mo. 2016), *appeal filed* 8/9/16, and *Lafollette v. Liberty Mut. Fire Ins. Co.*, 2016 WL 4083478 (W.D.Mo. 2016), *appeal filed* 8/15/16 is totally misplaced. *See* Pl. Memo, pp. 28-29. In *Labrier*, the defendant's "records contain[ed] the objective information necessary to identify class members." 2016 WL 4005998 at *10. Here, by contrast, such records do not exist. This fact is made amply clear by looking at the "evidence" that Plaintiff offers as an "exemplar" in support of his argument that class members can be identified from FCA US's records. *See* Pl. Memo, p. 29; *id.* at Ex. 7, p. 2. This record classifies Plaintiff as a person who owns his Jeep Vehicle for "***business***" purposes. *Id.*; *see also Saey v. CompUSA, Inc.*, 174 F.R.D. 448, 450 (E.D.Mo. 1997) (discovering individual class member

Plaintiff does not even suggest that there are. The need to conduct mini-trials just to determine who is in the class precludes certification. *See, e.g.*, *Secreti v. PTS of Am., LLC*, 2015 WL 3505146, *3 (M.D.Tenn. 2015) ("If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.").

Plaintiff's proffered class definition is further plagued by ascertainability problems in its non-specific reference to "current owners." "Current" as of when? Used vehicles are sold every day, and thus under the proffered class definition membership would be constantly changing. This District and other courts have noted that, to address one of the "primary concerns" related to the class definition, a plaintiff must offer a class definition that is not "amorphous, vague, or indeterminable." *In re Tetracycline Cases*, 107 F.R.D. 719, 727-28 (W.D.Mo. 1985); *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) ("[t]here can be no class action if the proposed class is 'amorphous' or 'imprecise'" (*quoting* 5 James W. Moore, *Moore's Federal Practice* § 23.21[1] (Matthew Bender 3d ed. 1997)); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (holding class definition was deficient because it was "amorphous and diverse"); *Carson P. ex rel. Forman v. Heineman*, 240 F.R.D. 456, 494 (D.Neb. 2007) ("[t]he boundaries of the class must not be amorphous" (citation omitted)); *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 861-62 (Mo. banc 2008) (class definition must not be "amorphous, vague, or indeterminable"). An ever-changing class precludes certification here because, as Plaintiff has explained during the course of these proceedings, the damages he seeks "travel with the vehicle." *See* Docket No. 9, p. 7. In other words, a "current owner" today will not suffer any damages if he re-sells his Jeep Vehicle at any time before a damage payout is made.

---

lacked standing to bring MMPA claim because he purchased computer for business purposes, and denying certification because it would require mini-trials to determine who was in class).

Finally, by proffering a class definition that spans 3+ years, Plaintiff's proposed class is way too broad in scope. Plaintiff's claims are based on FCA US's alleged statements that the Jeep Vehicles are "safe and not defective" which is set forth only in two press releases issued in June 2013. But, there is no evidence that any consumer, other than Plaintiff, ever saw these statements. *See* § II.A, *supra*. And, this statement was modified over time by other events, acts, and publicity. *Id.* Without some criteria limiting the class period to only that time period when this statement could have been read in isolation without reference to a myriad of contradictory other information, the class is simply too broad. Certification should be denied.

**B.      Failure To Prove Numerosity.**

Plaintiff speculates that because "more than 8,000 Jeep Vehicles have been sold in Missouri during the class period" there must be thousands of class members. *See* Pl. Memo, p. 12. Plaintiff's sheer speculation is insufficient to establish numerosity because class membership is dependent on the purchase of a Jeep Vehicle "without a skid plate" and for "personal, family, or household use." As the court held in *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596-97 (3d Cir. 2012), speculation is not evidence of numerosity. The *Marcus* court rejected the plaintiff's attempt to establish numerosity by proving there were 700,000 sales of vehicles equipped with the allegedly defective "run-flat" tires nationwide, noting this did not equate with how many persons purchased their vehicles in-state and had a tire go flat, two criteria required for class membership. 687 F.3d at 595-96. The *Marcus* court's analysis applies here where Plaintiff has offered absolutely no evidence as to the number of persons who purchased a Jeep Vehicle without a skid plate and for the specific purposes designated. And, notably, the Supreme Court has held that to certify a class a plaintiff must "***prove*** that there are ***in fact*** sufficient numerous parties." *Dukes*, 564 U.S. at 350 (former emphasis added); *see also Henke v. Arco Midcon, LLC*, 2014 WL 982777, *5 (E.D.Mo. 2014) ("the inability to ascertain

which particular plaintiffs belong in the class makes it difficult for the Court to determine whether requirements such as numerosity and typicality are met"); *Chorosevic v. MetLife Choices*, 2007 WL 2159475, *10 (E.D.Mo. 2007) (denying certification because, despite defendant administering health plans to millions, "[t]he issue before the Court is not how many persons are covered by a medical plan administered by UHIC, but rather, how many persons fall within plaintiffs' proposed class," *i.e.*, the subset for whom the plan was secondary).

There is no evidence supporting numerosity, and thus class certification should be denied.

## C.    Lack Of Common Questions.

The Supreme Court has expressly addressed the "commonality" requirement and indicated that the focus is not on the question itself but the potential answers to it:

> What matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Dukes*, 131 S.Ct. at 2551 (citation omitted; emphasis in original).

Here, the capacity to generate "common answers" is virtually non-existent.  Indeed, in seeking certification Plaintiff fails to identify any specific questions that will generate common answers.  Rather, he summarily asserts that there is a "common nucleus of operative facts" which he describes as:  "a uniform safety defect in the fuel tanks"; the purported ineffectiveness of the trailer hitch remedy; FCA US's "misrepresentations" made via "press releases and public statements"; and the "availability of a uniform remedy."  Pl. Memo, p. 14.  But, Plaintiff's conclusory statements ignore critical facts, including:  that his class encompasses different models and models-years of Jeep Vehicles that have differences which ***his own expert admits*** could affect the "defect" analysis; his own expert's admissions that the trailer hitch remedy had

effect; that not every consumer was exposed to the representations at issue; and that, even if they were, there was varying public information over time that would have affected whether any given consumer could have been deceived. *See* § II, *supra*. The fact that there was a changing context in which each consumer may have read the alleged actionable statements (if he read them at all), by itself, precludes certification. *See, e.g.*, *In re St. Jude Med., Inc.*, 522 F.3d 836, 838-39 (8th Cir. 2008) (reversing certification in case where class was exposed to different representations and noting that claims based on misrepresentations are unsuitable for certification because of variations as to what representations were received); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, 2007 WL 4287511, *6 (N.D.Ill. 2007) (typicality lacking where the class was "exposed to a mix of representations communicated through different channels and absorbed in different ways and to different degrees").

These differences make clear that Plaintiff's bald claim that there are "common" issues is legally and factually insupportable. For example, because putative class members did not purchase the same Jeep Vehicle, the "answer" to the question of whether there is a "defect" could be "yes" for one, and "no" for others, making it abundantly clear that "the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation" is missing. *See, e.g.*, *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, *6 (C.D.Cal. 2014) (finding common questions listed by the plaintiff were dependent on a common answer to the "defect" question, and, thus, because there was no common answer to the "defect" question, the other identified questions were not common).

Plaintiff has not explained how, or shown that, any question could generate the same answer for every putative class member. This is a critical failure requiring denial of certification.

**D.    Lack Of Typicality.**

"Typicality means that there are other members of the class who have the same or similar

grievances as the plaintiff." *Janson v. Legal Zoom.com, Inc.*, 271 F.R.D. 506, 510 (W.D.Mo. 2010) (citation omitted). Plaintiff's personal claims are unique. As an initial matter, he makes no personal challenge to the representations made by FCA US, but, rather, admits that his own complaints are solely about the "design and placement" of the fuel tank in the Jeep Vehicles, ***not what was said about them***. *See* § II.B, *supra*. Moreover, Plaintiff saw the alleged misrepresentations only when his lawyer showed them to him, long after his purchase. *Id.* And, when he finally saw them, he construed the articles in which they appeared to be conveying both "sides of the story," *i.e.,* that FCA US's statement that the vehicles were "safe and not defective" might be true or NHTSA's statement that they were defective might be true. *Id.* There is no proof that any other putative class member has a grievance remotely similar to Plaintiff.

Nor can Plaintiff's damage claim be characterized as "typical" of all other putative class members. Plaintiff has suffered no out-of-pocket losses, and he intends to drive his vehicle until it goes to the junk yard. *Id.* Clearly, his damages are not the same as those who may have actually experienced a fuel tank fire, those who have paid for repairs to the fuel tank as the result of a rear end collision wherein it was damaged, or those who have already paid out-of-pocket to have a "skid plate" installed on their vehicle.[16] This lack of typicality precludes certification. *See, e.g.*, *Henke*, 2014 WL 982777, at *10 (no certification where "[s]ome plaintiffs may allege only property damages; other plaintiffs might allege economic loss or even personal injury").

In seeking certification, Plaintiff ignores the critical differences in his grievance versus those of putative class members. *See* Pl. Memo, pp. 15-16. Instead, he treats the typicality requisite as identical to the commonality requisite, summarily arguing that there is a "uniform

---

[16]Because those with other types of damages are part of the putative class, they would be barred from future recovery for any personal injury and property damages under the doctrine of claims-splitting.

misrepresentation" and "uniform economic harm."  Even if these were the relevant issues (they are not), Plaintiff is wrong in his "uniform" characterization.  *See* §§ II.B & D, *supra*.

The lack of typicality requires denial of class certification.

## E.  Lack of Adequacy.

Rule 23 requires that both the proposed class representative and the proposed class counsel demonstrate with evidence that they "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4); *see also Dukes*, 564 U.S. at 349 n.5 (noting adequacy requirement "raises concerns about the competency of class counsel"). There is no proof of adequacy here, and the evidence proves it is lacking for multiple reasons.

*First*, a vigorous prosecution is necessary to meet the adequacy standard. *Morgan v. UPS of Am., Inc.*, 169 F.R.D. 349, 357 (E.D.Mo. 1996).  A vigorous prosecution is not evident here. The class discovery phase is closed and Plaintiff did not seek information during that phase to support his certification request by use of a single interrogatory or deposition. *See* § II.E, *supra*. Nor did Plaintiff hire experts to provide evidence that the alleged misrepresentations were actually received by class members, or one supporting the existence of some type of class-wide economic damages, both of which are critical to support his certification request. *Id.*  The fact that less than 10 minutes was spent on the phone preparing Plaintiff for the deposition testimony he would give on behalf of thousands of others, standing alone, raises a question as to how "vigorous" the prosecution of this case has been. *See, e.g.*, *In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 621 (D.Nev. 1998) (attorney has ethical duty to prepare witness for deposition). And, this Court cannot accept a self-serving declaration about the experience of counsel (Pl. Memo, p. 1; *id.* at Ex. 6), as a substitute for the actual vigorous prosecution of this case. *See* 7A Fed. Prac. & Procedure § 1769.1 ("[T]he extreme importance of the inquiry into the adequacy of class counsel means that the court should not be easily satisfied with a self-serving and one-sided

statement by the class attorney that he meets the requirements of the rule.").

*Second*, this case presents at least the appearance of, and perhaps an actual, disqualifying conflict of interest between Plaintiff and his counsel.  Plaintiff has a long-standing relationship with proposed class counsel and they have served him well, first by obtaining an inordinate amount out of a class settlement fund (without the payment of any fee), and then by representing him for free in an individual collection action.  *See* § II.C, *supra*.  Plaintiff's counsel's repeated prior *free* representations, combined with the nature of them, suggest that Plaintiff has some type of relationship with proposed class counsel, or, at a minimum, is indebted to them.  This presents a prohibited conflict of interest.  *See, e.g.*, *O'Shaugnessy v. Cypress Media, L.L.C.*, 2015 WL 4197789, *5 (W.D.Mo. 2015) (finding adequacy lacking because a "close personal relationship between the named plaintiff and class counsel creates a present conflict of interest—an incentive for the named plaintiff to place the interest of class counsel above the class" (citation omitted)).

*Third*, in the midst of this litigation and after she was subpoenaed for a deposition, Plaintiff's counsel undertook the free representation of a putative class member (Danielle Mitchell-Bush) who retains a right to object to any proposed settlement in this case.  *See* § II.C, *supra*.  This is a disqualifying conflict.  *See Moreno v. Autozone, Inc.*, 2007 WL 4287517, *4 (N.D.Cal. 2007) (finding class counsel inadequate where they represented absent class members objecting to class settlement).  This conflict is exacerbated by the fact that this witness was coached by Plaintiff's counsel to change her testimony during a break in her deposition.  *See* § II.C, *supra*.  This negates a finding of adequacy.  *See, e.g.*, *Prosser v. Avanti Petrol., Inc.*, 1999 WL 1116821, **1-2 (E.D.Mo. 1999) (ordering counsel disqualified "in the interest of the appearance of propriety" after he represented third-party witness at deposition who changed testimony after break); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995)

("The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit **even the appearance** of divided loyalties of counsel." (quotations omitted; emphasis added)).

*Fourth*, Plaintiff has his own issues which make clear that he cannot act as a fiduciary of the class. He lacks knowledge about the vehicles at issue, the nature of the legal dispute (he believes this case has nothing to do with FCA US's representations), and even the makeup of the class he is supposed to represent (he wants to represent owners regardless of whether their Jeep Vehicles have a skid plate and does ***not*** want to represent anyone who purchased a vehicle after reading the alleged misrepresentations). *See* § II.B, *supra*. Even more prejudicial to absent class members is the fact that Plaintiff intends to surrender their claims for diminution of vehicle value, property damage, and personal injury. This sort of forfeiture of class members' claims renders a class representative inadequate. *See, e.g.*, *In re BPA Polycarbonate Plastic Prods. Liab. Litig.*, 276 F.R.D. 336, 347 (W.D.Mo. 2011) ("There is no explanation for these omissions, and absent some explanation for Plaintiffs' decision to eschew these claims ... the Court cannot conclude these representatives can adequately represent the class."). Even if these facts were not disqualifying (which they are), Plaintiff has additional shortcomings as he is currently facing the prospect that summary judgment will be entered against him (and hence any certified class) based on his own testimony and unique facts, and has attempted to change multiple admissions made at deposition by use of an errata sheet. *See, e.g.*, *Buzoiu v. Risk Mgmt. Alternatives, Inc.*, 2004 WL 1505061, **3, 6 (E.D.Pa. 2004) (denying certification where plaintiff submitted errata making numerous changes to testimony; "[i]t is evident from the foregoing that [plaintiff's] personal credibility is so open to question that it is likely to harm her case").

Adequacy is lacking, and thus certification should be denied.

**F.** **Individual Questions Predominate.**

The predominance standard for class certification is "far more demanding" than the commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Where common answers to core questions are not possible, or where there are unique issues requiring claimant-specific evidence, adjudication by representation is impractical and class certification must be denied. *See Dukes*, 131 S.Ct. at 2556. As this District has stressed, even where "the legal issues or underlying theories of recovery involved may be common to all class members," this "does not mean that the ***proof required*** to establish these same issues is sufficiently similar to warrant class certification." *Dumas*, 2005 WL 2172030, *3 (citation omitted). Here, it is difficult to discern ***any*** common question as individual issues abound.

In seeking certification, Plaintiff spends almost the entirety of his predominance argument trying to convince this Court that the issue of "defect" is common, and he baldly declares that "[t]he existence of a common defect in the Jeep Vehicles is sufficient for the Court to find that predominance is satisfied." Pl. Memo, p. 20. But, at Plaintiff's insistence, this Court has concluded that the "defect" issue is not what is at the heart of this case because ***it does not present "a product liability claim actionable on the basis of an alleged design defect,***" but rather "a consumer protection claim actionable on the basis of FCA [US's] misrepresentation of the Jeep Vehicles." Docket No. 18, p. 13. Because this is a "misrepresentation" case, to determine whether common issues predominate an examination of the elements of a MMPA claim is required, and this examination makes clear that common issues do not predominate.

**1.** ***Class Members Were Exposed To Differing "Representations".***

The most basic element of an MMPA claim is a deceptive representation. *See, e.g.*, *Toben v. Bridgestone Retail Operations, LLC*, 2013 WL 5406463, **1-2 (E.D.Mo. 2013), *aff'd*, 751 F.3d 888 (8th Cir. 2014). Here, this issue is clearly an individual one since there is no

evidence, whatsoever, that the allegedly deceptive statements that "the Jeep Vehicles were safe and not defective" were seen, or even made available to, the entire class, and, moreover, the purported "deceptive" nature of any such statement would have necessarily been impacted by the differing contexts in which class members viewed it. Allegedly deceptive statements must be adjudged against the background, and in the context, that surrounds them. *See, e.g.*, *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 132 (Mo. banc 2010). Here, that background and context changed throughout the class period, and it changed dramatically just two weeks after the alleged statement was made. *See* § II.A, *supra*.

Plaintiff's own testimony amply demonstrates why the "deception" issue is an individual one. Plaintiff admits that by the time he read the statements at issue, news articles contained information about the competing views as to whether the vehicles were safe and defective, and he understood both sides of the story. *See* § II.B, *supra*. Because the core issue of whether a representation was deceptive is based on facts existing at the time of sale, this issue is an individual one which precludes certification. *See, e.g.*, *Rigby Corp. v. Boatmen's Bank & Trust Co.*, 713 S.W.2d 517, 540 (Mo.App. 1986) ("The truth or falsity of the representation … is determined as of the time it was made."). For instance, a jury could find that vehicles that at the time of sale did not include a trailer hitch recall remedy installed were not safe, whereas the many but unknown number of vehicles purchased with the recall remedy were indeed safe, and thus as to these vehicles there was no deceptive representation at all.

### 2. Whether The Statements Were "In Connection With" A Sale Is An Individual Issue.

For a misrepresentation to be actionable under the MMPA it must have been made "in connection with" a sale. *See, e.g.*, *Toben*, 2013 WL 5406463 at **1-2. This, too, is an individual issue. As this Court has noted, the "in connection with" requirement means that there

must be "a relationship between the alleged misrepresentations and the Jeep Vehicle purchases." *Faltermeier v. FCA US LLC*, 2016 WL 4771100, *7 (W.D.Mo. 2016). Obviously, there can be no "relationship" between FCA US's alleged statement that the Jeep Vehicles are "safe and not defective," and an individual's purchase of one, if that individual never saw a media story or other source where such a statement appeared. This is not a case where an allegedly deceptive statement was made in a form written contract signed at the time of every consumer's purchase of a product. And, Plaintiff has submitted no evidence, whatsoever, which even suggests that a significant portion of putative class members would have read an article where the allegedly deceptive statement appeared. Indeed, Plaintiff admits that he did not read any statement made by FCA US (in the media or elsewhere), let alone the allegedly deceptive ones at issue, at or near the time that he purchased his Jeep Vehicle. *See* § II.B, *supra*. This makes it abundantly clear that the "in connection with" element is an individual, not common, issue.

### 3. The Requirement Of An "Ascertainable Loss" Is An Individual Issue.

No consumer can pursue a MMPA claim unless he suffered an "ascertainable loss." *See, e.g., Toben*, 2013 WL 5406463 at **1-2. As Plaintiff acknowledges, he seeks to have damages assessed here under a "benefit-of-the-bargain model," which "compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." Pl. Memo, p. 23. Plaintiff baldly declares that this is a common issue, but he submits no evidence proving that such damages can be proven or calculated on a classwide basis. And, as the only evidence before this Court proves, they cannot. *See* **Ex. L**, ¶ 33-35. The undisputed evidence proves that it is impossible to employ any methodology that would allow for classwide assessment of benefit-of-the-bargain damages because this case involves only the purchase of used vehicles, and putative class members would have paid varying prices which would have been dependent on a multitude of factors. *Id.*, ¶¶ 7-13. Indeed, there is no such thing as an

identical vehicle in the used car market. *Id.* Thus, it is not even a "common" issue as to whether each class member suffered an ascertainable loss at all, let alone the amount of that loss.

The individualized nature of the damage issue is clear when one considers that damages under the benefit-of-the-bargain rule must be measured "as of the date of purchase." *Shiplet v. Copeland*, 450 S.W.3d 433, 441 (Mo.App. 2014); *Harris v. Union Elec.*, 766 S.W.2d 80, 86 (Mo. banc 1989). Here, any difference between the bargained-for value and the value actually received, as of the purchase date, will vary by class member. For example, what if, on the date of purchase, a class member purchased a Jeep Vehicle that had significant mechanical issues, but the purpose of his purchase was simply to use various components of it for another vehicle and he used the vehicle exactly as intended? Clearly, that purchaser got the entire benefit-of-the-bargain he struck on the date of purchase. Since the Jeep Vehicles are now as much as 23 model-years old this scenario is entirely possible. Because used vehicle purchase prices are subject to a multitude of varying factors such as overall condition, mileage, and number of prior owners (*see* **Ex. L**, ¶¶ 9-13), benefit-of-the-bargain damages are not susceptible to class wide treatment and preclude certification. *See, e.g.*, *True v. Conagra Foods, Inc.*, 2011 WL 176037, *6 (W.D.Mo. 2011) (denying certification for lack of predominance on claim concerning voluntarily recalled product in part because recovery "would depend (at least in part) on the purchase price," which "would likely vary among members" because, *e.g.*, "some members may have used a coupon").

Issues such as potential out-of-pocket payments potentially linked to the alleged misrepresentations, personal injury, property damage, and attempts to resell further make an individualized damage assessment necessary. A used motor vehicle is simply not like a typical consumer product, where consumers all pay the price listed on the shelf and receive the exact

same product.  The purchase of a used vehicle is personal and unique, and dependent on a host of factors.  *See* **Ex. L**, ¶¶ 7-13.  Each bargain, like Plaintiff's, is individually negotiated.  *See* § II.B, *supra.*  Thus, the damage issue is not common, and class certification must be denied.

**4.      Causation Cannot Be Proven By Common Evidence.**

The MMPA mandates proof that any claimed "ascertainable loss" was incurred "as a result of" the alleged deception which forms the basis of the claim.  *See, e.g.*, *Toben*, 2013 WL 5406463 at \*\*1–2.  Missouri law is clear that to establish this critical causation element each putative class member would have to establish that he was actually exposed to the allegedly deceptive statements *before* his vehicle purchase. *See, e.g.*, *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 230 (Mo. banc 2013);[17] *see also Ebert*, 823 F.3d at 479 (reversing grant of certification for lack of predominance where "[a]djudicating claims of liability will require an inquiry into the causal relationship" between the alleged wrongdoing and alleged harm); *St. Jude*, 522 F.3d at 840 (reversing certification on consumer fraud claim based on individualized issues of "causal nexus" and defendant's right to present individual evidence on this issue as to each plaintiff).   Because this case is premised on statements made publicly, and not on statements directed to consumers, the only way to prove whether any particular putative class member was exposed to any allegedly deceptive statement is by an individual inquiry.  Indeed, Plaintiff offers no evidence of any nature – no surveys, no statistical analysis – even suggesting that the alleged misrepresentations reached anyone, let alone a statistically significant number of putative class members.  This readily distinguishes this case from those cited by Plaintiff.  For

---

[17] *Chochorowski* is the Missouri Supreme Court's leading opinion on the MMPA's causation requirement.  Plaintiff ignores it, and relies instead on the earlier opinions, neither from the Missouri Supreme Court, of *Plubell v. Merck & Co.*, 289 S.W.3d 707 (Mo.App. 2009) and *Stephens v. Arctic Cat, Inc.*, 2012 WL 628867 (E.D.Mo. 2012).  *See* Pl. Memo, pp. 21-22.  Neither case is relevant here; in fact, *Stevens* did not even involve class certification.

example, in *Glen v. Fairway Indep. Mortg. Corp.*, 265 F.R.D. 474, 480 (E.D.Mo. 2010), *order clarified*, 2010 WL 891621, class treatment was appropriate only because the defendant's allegedly false promise appeared in a "standardized form contract," which was necessarily seen by all plaintiffs pre-transaction. Because causation requires individual proof, certification should be denied.

### 5. *The Issue Of "Defect" Is Not Common.*

Plaintiff disavowed that this case was about a "defect" when he argued against transfer to the bankruptcy court. *See* Docket No. 52. However, to the extent the "defect" issue is relevant here, it, likewise, is not amenable to common proof. *See* § II.D, *supra*. The defect/safety issue is not the same for all the Jeep Vehicles. *Id.* Indeed, Plaintiff's own expert admits that a number of factors must be considered in assessing the defect/safety issues inherent in a rear-mounted fuel tank, and the undisputed evidence before this Court proves that these factors varied not only between the different models of the Jeep Vehicles, but also between different model-years of the same model. *Id.* Significant differences in the Jeep Vehicles include, but are not limited to: the "proximity of the fuel tank in the Jeep Vehicles to the rear bumper"; the "ground clearance and ride height"; the makeup and construction of the fuel containment system; the vehicles' center of gravity; the shapes of the fuel tanks; the potential for underride; the fuel tank environment; and protective structures in the rear of the vehicles. *Id.* And, Plaintiff cannot prove that these differences do not matter because his own expert did no assessment of them (in fact, he does not even know what the differences are). *Id.* Even if Plaintiff's expert had opined that these differences do not matter to his own defect/safety assessment (which he did not do), they matter to FCA US's defense, and it has a right to defend each of the multitude of configurations of the Jeep Vehicles which Plaintiff puts at issue. Thus the defect/safety issue is not a common one.

Plaintiff cannot gloss over the multitude of variations in the Jeep Vehicles simply by

claiming that FCA US "admitted" a "common defect" by issuing a recall. *See* Pl. Memo, p. 20. A recall "does not preclude [a defendant] from contending in a legal suit for damages that its liability will turn on issues that affect each" class member and his vehicle differently. *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 345 (D.N.J. 1997). And, this District (like other courts) has found predominance lacking when, during the class period, a product was subject to multiple modifications and iterations so that there is no single product to evaluate. *See Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 98 (W.D.Mo. 1997); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1081, 1085 (6th Cir. 1996); *In re Ford Motor Co. Bronco II*, 177 F.R.D. 360, 364 (E.D.La. 1997). Class certification should be denied.

**G.     A Class Action Is Not Superior.**

Plaintiff declares that the superiority requisite is satisfied based on one conclusory assertion: this case is like other cases that have been certified. *See* Pl. Memo, pp. 27-28. Plaintiff's complete failure to provide any serious analysis, let alone proof, that superiority is met is grounds enough to deny certification. In any event, a class action is not the superior way to resolve this controversy because a host of mini-trials, starting with the issue of identifying class members and continuing through the assessment of damages, would be required. *See supra.* This precludes a finding of superiority. *See, e.g.*, *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir 2005) (noting case becomes "unmanageable" and "little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently").

Furthermore, Plaintiff's speculation that, absent certification, "the rights of the putative class members may go unprotected" is not factually or legally supportable. *See* Pl. Memo, p. 27. Even, putting aside the small claims courts that are readily available for individual claims, there is a remedy available to putative class members through NHTSA. This is a particularly compelling reason to find that superiority is lacking here because that agency has been

extensively involved in the "defect" issue Plaintiff presents, even to the extent of conducting vigorous crash testing. Courts have repeatedly found that when NHTSA has already addressed an alleged vehicle "defect"/"safety" issue, the superiority requisite for class certification cannot be satisfied. *See, e.g.*, *Martin v. Ford Motor Co.*, 292 F.R.D. 252 (E.D.Pa. 2013); *Johnson*, 285 F.R.D. at 584 (E.D.Cal. 2012); *Daigle v. Ford Motor Co.*, 2012 WL 3113854, *5 (D.Minn. 2012); *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998); *In re Ford Motor Co. Ignition Switch*, 174 F.R.D. at 353; *Ford Motor Co. v. Magill*, 698 So.2d 1244, 1245 (Fla.App. 1997); *Am. Suzuki Motor Corp. v. Superior Ct. of Los Angeles Cty.*, 37 Cal.App.4th 1291, 1299 (1995). Anyone unhappy with NHTSA's resolution of the "defect" issue, has the right to seek further relief directly from that agency. *See* 49 U.S.C. § 30162.

Finally, Plaintiff's argument that without certification there will be "a potential flood of duplicative individual lawsuits" is belied by the facts. *See* Pl. Memo, p. 27. The rear fuel tank issue in the Jeep Vehicles has been a subject of widespread media attention for years, and owners of the Jeep Vehicles received individual notice of the alleged "defect" years ago as part of a recall. Yet, this class action is one-of-a-kind, and the only individual action ever filed anywhere in the country raising similar allegations was dismissed at the pleading stage *sua sponte*. *See Katz v. Fiat/Chrysler Auto.*, 2015 WL 2452419, *2 (M.D.Pa. 2015). In other words, consumers have not clamored to the courthouse steps asking courts to order FCA US pay to for a "skid plate" that they did not bargain for at the time of purchase. The denial of class certification will clearly not result in a flood of individual lawsuits; in fact, the evidence supports only the notion that it will not result in the filing of any other lawsuit at all. Class certification should be denied.

## IV. CONCLUSION

For the reasons set forth herein, Defendant FCA US LLC respectfully requests that this Court deny Plaintiff's Motion for Class Certification.

**THOMPSON COBURN LLP**

By: /s/ Sharon B. Rosenberg
      Kathy A. Wisniewski, MO #38716
      kwisniewski@thompsoncoburn.com
      Sharon B. Rosenberg, MO #54598
      srosenberg@thompsoncoburn.com
      Stephen D'Aunoy, MO #54961
      sdaunoy@thompsoncoburn.com
      One US Bank Plaza
      St. Louis, Missouri 63101
      (314) 552-6000
      (314) 552-7000 (fax)

      *Attorneys for Defendant FCA US LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 6th day of October, 2016, a true copy of the foregoing was filed electronically with the Clerk of the Court to be served via operation of the Court's electronic filing system upon the following:

Christopher S. Shank
David L. Heinemann
Stephen J. Moore
SHANK & HAMILTON, P.C.
2345 Grand Blvd., Suite 1600
Kansas City, Missouri 64108

        /s/ Sharon B. Rosenberg